[No. D018680. Fourth Dist., Div. One. Jan. 27, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DEWANE BRANDON, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*This opinion is certified for publication with the exception of part III.

COUNSEL

Kristine M. Woodward, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Carl H. Horst and Patti W. Ranger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—Michael Dewane Brandon was convicted by a jury of kidnapping for robbery (Pen. Code,[1] § 209, subd. (b)) and robbery (§ 211). In connection with each offense, the jury also found true the allegation Brandon had personally used a knife. (§ 12022, subd. (b).) In separate proceedings, the court found true allegations Brandon had suffered a prior prison term[2] and a prior serious felony conviction. After denying his motion for a new trial, the court sentenced Brandon to prison for "the indeterminate term of life, plus nine years for the enhancements."

---

[1]All statutory references are to the Penal Code unless otherwise specified.

[2]As we will discuss later, the record is in conflict as to the trial court's findings on the prior prison term allegations under section 667.5, subdivisons (a) and (b).

Brandon appeals, contending the trial court committed prejudicial error in the admission of other crimes testimony, in the admission of the victim's photographic and in-court identifications, in the exclusion of the results of a case-specific identification experiment, in instructing the jury under CALJIC No. 2.21.2 (witness willfully false) and in imposing both a prior prison term violent felony enhancement (§ 667.5, subd. (a)) and a prior serious felony conviction enhancement (§ 667, subd. (a)) based upon his 1987 conviction, for which he served a prison term. Having thoroughly reviewed the record, we conclude any error was harmless and affirm.

BACKGROUND

A. *The Instant Offense*

Sometime after 11 p.m. on August 22, 1992, Inger Gonzales, who had just gotten off work and was driving her sister's red Nissan Sentra, pulled into a Vons shopping center located on the southeast corner of College Avenue and El Cajon Boulevard in San Diego to use a telephone booth there to call her sister to tell her she would be late arriving home. At that time, the Vons store was open and other cars were parked out front. After Gonzales parked her car next to the others and had gotten out and walked to the telephone booth, she discovered she did not have enough change to place the call. She thus walked back to the car to get more money.

As she sat in the driver's seat with the door ajar and one foot outside, she looked for some more change in her wallet which she had left in the front passenger seat. As she did so, she noticed out of the corner of her eye someone walking quickly toward her. Sitting up and looking more closely, she saw a man with a very angry look on his face coming straight towards her with his right hand tucked into the front of his loose-fitting pants. Frightened, Gonzales pulled her foot inside, shut the door and locked it. She tried to start the car and back out, but stalled the engine.

At that point, the man put his arm through the open driver's side window, unlocked the door and jumped inside. As he did so, Gonzales moved to the passenger seat to try to get out of the car, but the man grabbed her arm and then held a large kitchen knife[3] to her ribs. To her repeated cries of "no," the man told her, "Shut up. Shut up, you bitch." He then tried to start the car

---

[3]The knife was described at trial as having a wooden handle that was faded to a dull gray and a blade about eight to nine inches long and triangular in shape.

while holding the knife against her ribs. Unable to do so, he asked her how to start it and then asked her where the clutch was. Once he got it started, he backed up and drove slowly, jerking the car as if he did not know how to use the clutch correctly.

In the meantime Gonzales tried to stay calm so as not to anger the man. She sat on her wallet and held her hands between her knees, trying to hide her jewelry and her wallet. When the man stopped at a stop sign in the shopping center's parking area, he asked Gonzales how much money she had. When she told him $20, he turned, looked her up and down and licked his lips. He then began driving through the shopping center parking lot slowly again.

As he did so, Gonzales tried to figure out a way to escape, glancing to see if the passenger door were locked. She also tried to wedge her arm between her ribs and the knife, so that if he stabbed her the blade would hit her arm instead of her body. As she sat there she made a point of looking at him so she could remember his face, being careful, however, not to be too obvious since she did not want to invoke his anger.

As they drove near a Taco Cabana restaurant, Gonzales saw a group of people get out of a car and walk towards the restaurant. They were on the left side of the man so that when she tried to make eye contact with them to signal for help she got another glance at the man's face. The man shoved the knife closer to her ribs and threatened to kill her if she said anything. He then left the parking lot, driving onto College Avenue and then turning right onto El Cajon Boulevard, past the restaurant. At that time he suddenly sped up.

As he removed his hand from the steering wheel to shift gears, Gonzales opened the passenger door and jumped out, flipping and rolling over a few times as she landed in the street.[4] She rolled to the gutter to get out of the way of cars coming towards her, and then got up and ran to the restaurant, screaming for help. Police officers who were at a convenience store across the street heard her screams and drove over to the restaurant to investigate.

---

[4]Gonzales testified at trial she decided to jump when she saw that they were leaving an area where there were lights and some people; she figured the man was too busy shifting gears to fatally stab her at that point. She estimated the car was going about 35 miles per hour when she jumped and that the distance she had traveled with the man was about half a mile.

Gonzales told the officers what happened and the police put out a bulletin, giving a description of the car and man.[5]

Shortly thereafter, the La Mesa police located the car and apprehended its driver. The policemen with Gonzales drove her to where the car was and asked if she could identify it or the suspect, who at that time was standing with some plain clothes policemen by a police car. Gonzales identified the car, but did not see the person who abducted her.[6] Gonzales later was treated at a hospital for pulled ligaments and muscles in her right hip and leg, and also for minor scrapes and bruises.[7]

Ten days later, when San Diego Police Detective William M. Nemec showed Gonzales a photographic lineup with five photographs placed in a loose stack, Gonzales immediately selected Brandon's photograph, the third photograph she was shown, saying, "That's him. That's the one that got into the car with the knife."

B. *The Trial*

The jury was presented with the above evidence via Gonzales's testimony and that of two law enforcement officers. Gonzales identified Brandon in court and stressed her opportunities to see his face. She focused on him as he came toward her and the car, again when he told her to "shut-up," when he turned and looked her up and down for about 10 seconds and when she saw the people outside the restaurant as they drove by. Her best look was when he stopped for about 15 seconds at the stop sign in the shopping center's lot. She instantly picked him out of the stack of photos she was shown 10 days after the event and identified him at the preliminary hearing in this matter; she was positive he was the man who attacked her.

Gonzales reiterated for the jury the description she had given the police that night: he wore baggy pants with elastic waist and ankles, a dark gray

[5]One of the officers testified at trial that he saw the red car driving away as he talked with Gonzales. It appeared to him that the driver was having problems with the gears as it was "jerking forward."

[6]The suspect was a man by the name of Peyton Guiles. Gonzales identified him at trial as the man who was at the curb with the officers. She was positive he was not the man who abducted her. The officer who testified about taking her to the curbside showing said Gonzales did not hesitate to say that Guiles was not the man who had attacked her.

[7]At trial she also stated she had had to seek counseling after this ordeal to help her deal with her emotional trauma.

color with a short-sleeve (to the elbow) T-shirt in grey with pink and orange specks (surfer type), he had short, close-cut, dirty blond, thick, somewhat wavy hair (that night his hair was combed back and not in his face like it was in the photograph shown her by the detective), he was unshaven, somewhat scruffy, had a light complexion, medium build and was wearing Nike high-top sneakers with the turquoise Nike symbol.

Detective Nemec testified about the photographic lineup, describing how he chose the photographs and how he showed them to Gonzales with appropriate admonishments.

A man by the name of Kenneth Small testified, stating he knew both Brandon and Peyton Guiles (the man who was caught driving Gonzales's sister's car after Gonzales had reported the events of that night to the police). Earlier on the day of the abduction, Brandon and Guiles had visited Small, who gave Brandon $20 so he and Guiles could take some women to a movie that night. Around 4 or 5 p.m. Small saw them again at his house, where Guiles, who was temporarily staying with Small, changed clothes after going to the beach. The next morning Brandon stopped by Small's house to do some work for Small. He told Small he and Guiles had gone to the movies as planned and that he left Guiles about 11 p.m.

Small testified he later received a telephone call from Brandon who said he hoped Small wouldn't say anything in court to hurt him.

## C. *Evidence of Other Crimes*

Over the objection of defense counsel,[8] the prosecution also presented the testimony of two young women who described earlier events where each had been approached by Brandon in a parking lot with a weapon while in or near her car, forced into the passenger seat and asked for money and then abducted or left.

Michelle East testified that on February 23, 1987, when she got out of her car after having gone back to it to retrieve her license for identification to get into the Family Fitness Center in El Cajon, and turned to shut and relock her

---

[8]The specifics of the *in limine* motion and subsequent defense objections regarding the other crimes evidence will be summarized in the discussion. The admission of other crimes evidence of another victim, Paul Hilgeman, was stricken after he began to testify.

car door, she felt something in her back and heard someone tell her to get inside the car. She turned around again and saw Brandon holding a gun to the front of her ribs. He overcame her protests, holding the gun at waist level pointed at her head as she got in the driver's side and then moved over to the passenger side. Still pointing the gun, Brandon got into the driver's seat and asked for the keys. He put the keys in the ignition and told her they were going for a ride. East said she was not going to leave the parking lot with him and, after arguing a bit, asked him if there was something else that he wanted. After thinking a few moments, Brandon said, "I guess I really just want money." East said, "No problem," and reached into her purse and pulled a $50 bill and some change out of her wallet to give him. She told him she had nothing else and pleaded with him to leave. Brandon told her not to cry, that he did not want to hurt her and that he needed the money for his mother. After a few minutes and more pleading, he agreed to leave, but warned East not to get out of the car because he would have the gun pointed at her.

Claudine McLaen testified that on February 15, 1987, about 4 p.m., she left the May Company store in Parkway Plaza Shopping Center in El Cajon, walked to her car parked nearby, got in and sat in the driver's seat for a few moments checking a receipt for an item she had just returned. As she did so, Brandon approached and pointed a gun at her head through the open part of her window and ordered her to move over. Brandon then got in the driver's seat and continued to hold the gun to her left side. He rifled through her purse that was sitting on the floor between the seats, telling her he wanted her money as he took $27 from her purse. He then drove the car out of the parking lot, telling her he was going to a house where some people were waiting for him. At some point he made McLaen drive the car, having her stop near a bowling alley and a bank in Lemon Grove. He told her he wanted her car and that he was thinking of robbing someone else because he needed more money. McLaen was afraid as Brandon continually kept the gun near her. After almost seven hours, Brandon walked away and McLaen drove off.

## D. *The Defense Case*

Brandon's stepsister, Rea Chilcote, his stepfather, Monte Chilcote, his mother, and an eyewitness expert testified on his behalf.

His stepsister, who had known Brandon for over 20 years and was also a good friend, said she returned to her home in Loma Portal with her daughter around 7:30 p.m. on the August night in question after attending her

nephew's birthday party. Sometime later her father, Brandon's stepfather, returned to the home and then still later, Brandon. At that time Brandon was not wearing surfer-type clothes as described by Gonzales and his stepsister had never seen him wear such clothing. After she gave Brandon some bedding around 11 p.m. so that he could sleep on a couch in the family room, she said good night to him and her father. On cross-examination, she conceded she had not given any of her information to either the police or the prosecutor, although she did relay it to defense counsel and his investigator.

The stepfather testified that Brandon had come by the home to visit and discuss who would pick up Brandon's mother from the airport the next morning. At that time, Brandon was not wearing "surfer-type" clothes and he had never seen him wear anything other than Levis, or a pair of baggy shorts. When he fell asleep in a chair in the family room around 11:30 p.m., Brandon was asleep on the couch there. When he awoke around 2 or 3 a.m. the next morning, Brandon was still lying on the couch. He denied telling the district attorney's investigator that Brandon was gone from the house at 11 p.m. on the night in question.

Brandon's mother testified Brandon never wore the type of clothing described by Gonzales and that he had a very obvious tattoo of a tiger on his right arm, which extended from above his elbow all the way up to his shoulder. She had been in Montana the night of the crime and flew in to San Diego the next morning. Both Brandon's mother and stepfather testified Brandon knew how to drive a stick-shift car with a clutch and did so without any problems.

Dr. Scott Fraser, a psychologist, testified about the factors that affect eyewitness identification. He stated that research shows the accuracy of a person's identification decreases when the person is frightened or when a weapon is present. Factors such as the duration of a person's opportunity to observe the suspect, the time between the event and the identification, and stress also affect the accuracy of such.

Fraser also discussed the accuracy of various types of lineups, i.e., photographic versus live, opining live lineups produce more accurate results. He noted the chances that an earlier photographic lineup identification might influence a person's memory of the actual suspect and how such could affect in-court identification, regardless of whether a correct choice had been made. Fraser further noted that people who are positive in their identifications are just as likely to be mistaken as those who express ambivalence.

## E. *Rebuttal and Surrebuttal*

On rebuttal, Small stated he did not remember what Brandon wore on the afternoon of August 22, 1992. Brandon's mother testified she knew the extent of Brandon's wardrobe for only the three weeks before his arrest. Gonzales testified the T-shirt Brandon wore that night covered his upper arms and she did not see anything above the forearm. She recalled his eyes as being very deep set and angry looking.

Also in rebuttal, District Attorney Investigator Richard Johnsen testified Brandon's stepfather told him in an interview on January 6, 1993, that he did not recall what time he returned home on the night in question, that he fell asleep and when he awoke between 11 and 11:30 p.m. Brandon was gone, and that when he awoke again in the early morning he thought Brandon was there, but he was not sure. Later, after Johnsen prepared a written report of these statements, Brandon's stepfather called Johnsen to tell him there were inaccuracies and gave him times that were consistent with his trial testimony. Johnsen had not given the report to the stepfather.

In surrebuttal, the defense investigator testified she interviewed Brandon's stepfather on November 3, 1992, and at that time he gave an account of the pertinent times and events consistent with his trial testimony.

DISCUSSION

I

*Prior Crimes Evidence*

▮ Brandon first contends the trial court committed prejudicial error when it admitted evidence of his crimes against East and McLaen on the grounds such was relevant to the issue of intent. Because his defense in this case was mistaken identity, he specifically argues intent was not at issue in his crimes against Gonzales and thus the evidence of his earlier crimes was not relevant other than to show he had the propensity to commit such crimes and was highly prejudicial. On this record, there was no error in the admission of such evidence.

*In limine*, the prosecutor moved to admit evidence of prior offenses committed by Brandon, arguing the 1987 crimes against Michelle East,

Claudine McLaen and Paul Hilgeman were sufficiently similar to the crimes alleged in this case to warrant their admission on the issues of identity and intent, both of which the prosecutor needed to prove for Brandon's conviction of the crimes against Gonzales. Defense counsel strenuously argued there were not sufficient similarities between the past and present crimes and that to admit such evidence would be violative of Evidence Code section 1101, subdivision (a)[9] and unduly prejudicial under Evidence Code section 352.

The trial court ruled, stating: "The similarities that have been set forth both by counsel in their arguments and by the People's pleadings at page 13 and 14 of their trial memorandum, re: admissibility of prior acts, are not so distinctive as to allow their use to prove identity. But I'm satisfied that there are sufficient distinctions to show intent. [¶] In other words, if we had these prior acts and didn't know the identity of the defendant, we could not conclude from the facts these prior acts were committed in such a fashion that it was the defendant who committed the present offense. They don't have that type of signature to them. But when you have the present incident and you have the other evidence of identity and you are attempting to prove what his intent was, then I'm satisfied that there is sufficient distinctiveness in those prior acts to allow them to be used to show that intent. [¶] . . . [¶] The distinctive features as I see them are the fact that all the abductions were initiated in a parking lot. The common elements as to a couple of them, shopping centers, . . . [¶] In virtually all of them, he requires the victim to move to the passenger seat or passenger side of the vehicle. [¶] In each he uses a weapon, although most recently, it's a knife instead of a firearm. [¶] The handling of the weapon in each case is similar both in the location and the manner in which it's displayed and the directing it at the area of the victim's ribs. [¶] There is a certain similarity in the way the defendant expresses an interest in the vehicle, the way he delays his inquiry about money, . . . his motive is not immediately apparent and that is because of . . . the way he works up to the subject of money. [¶] Given those similarities, I'm satisfied that the prior offenses are admissible to show his intent and the current offense, and in making that finding, I've considered the probative versus the prejudicial value, and I find the probative outweighs

---

[9]This subdivison provides: "Except as provided in this section and in [Evidence Code] Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) of Evidence Code section 1101 provides in pertinent part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, *intent*, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Italics added.)

the prejudicial. [¶] Certainly there's significant and substantial prejudicial value, but it meets the standard to allow its admission."

Defense counsel then objected that all three prior crimes would be more prejudicial than just one and asked the court to limit the admission of the evidence in addition to giving limiting instructions to the jury. The court denied the motion to limit the admission of the other crimes evidence because "the fact that [Brandon's] done it [robbed people] three times is stronger evidence that that was his intent at this time . . . ." When defense counsel persisted, the court made clear that if there were no evidence in this case of identity to establish that it was Brandon, it would be difficult to admit the evidence, but since there was, i.e., Gonzales's testimony, the question becomes "what was his intent."

Later, out of the jury's presence, the court modified CALJIC No. 2.50, which cautions the jury about the limited use of uncharged criminal acts, in the fashion suggested by defense counsel, that it be limited to refer to the issue of intent only and that it admonish the jury that "before [it] may consider the evidence of alleged prior criminal act or acts [it] must first determine . . . that Mr. Brandon was . . . the individual who was responsible for the kidnap [in this case] beyond a reasonable doubt."[10] Then before the prosecution introduced any of the witnesses to testify about the other crimes, the court admonished the jury under CALJIC No. 2.50, as modified.[11]

After East and McLaen testified, and Hilgeman began to testify, the court asked counsel to approach the bench for a conference outside the jury's presence. It had reviewed the earlier probation reports and did not see anything about a robbery of Hilgeman. The prosecutor noted Brandon had taken Hilgeman's car, but had not gotten Hilgeman into the car or attempted to rob him in the car, although arguing he tried. The court reconsidered its earlier ruling, stating "[i]n order to have the similarity it needs, it has to have the element that we're trying to show is the intent to rob. [¶] . . . [¶] []This

---

[10]The court specifically stated: "Before you may consider the evidence of the alleged prior criminal acts, you must first determine that the defendant is the person involved in the crime charged. You are not permitted to consider such evidence for any other purpose."

[11]In addition to the above limitation, the court told the jury: "Ladies and gentlemen, the People are going to introduce evidence for the purpose of showing that the defendant committed crimes other than . . . that for which he is on trial. [¶] Such evidence, if believed, is not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence is received and may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged."

case doesn't have that. [¶ . . . [¶ []The only reasoning it's coming in [on] this case is after he gets in the car it's with the intent to rob them of money." The defense agreed with the court. The prosecutor tried to justify Hilgeman's testimony as being relevant to show robbery of the car. The court stated its ruling on the other crimes evidence was limited to prove Brandon's intent to steal money once he abducted the person and that if Hilgeman's case did not have that, it was no longer relevant. Defense counsel then objected to Hilgeman's testimony before the jury and moved that it be stricken. The court sustained the objection on the grounds of relevancy and admonished the jury to disregard Hilgeman's testimony.

After the People rested, in the absence of the jury, defense counsel moved for dismissal of the kidnap for purposes of robbery charge on grounds there was insufficient evidence presented to show a specific intent to rob prior to the actual alleged kidnapping. It was argued the evidence thus far only showed a robbery of the car which Gonzales was driving before any kidnapping occurred. And, since nothing was taken and Gonzales was only asked if she had any money, no robbery or intent to rob was shown to support the kidnap for robbery charge. The court denied the motion. It also denied defense counsel's renewed dismissal motions on the same grounds at the end of the defense case and again at the end of rebuttal testimony.

At the conclusion of all evidence, the court again instructed the jury on the above limiting instruction during the formal instructions to the jury before closing arguments and deliberation. Although defense counsel only argued the issue of identity in closing, the prosecutor argued both identity and the specific intent to rob concerning the kidnap for robbery and robbery charges.

Contrary to Brandon's appellate contention otherwise, the admission of the other crimes evidence in this case was not error. ■ As our Supreme Court recently noted in *People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757], "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to

support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]"

Here, as noted by the trial court, the two prior crimes were sufficiently similar to the events in Gonzales's abduction. Each occurred in a parking lot where the victim was approached by Brandon with a weapon near or in her car, and the victim was told to move into the passenger seat and later was asked about or for money. The prior incidents were relevant to prove Brandon's intent to rob, since his actions while in Gonzales's car were ambiguous, with him asking if she had any money but not requesting it and then also licking his lips while looking her up and down. The other crimes evidence was thus very probative in finding Brandon had the intent to rob Gonzales and kidnapped her with the intent to do so.[12]

The record also reflects the trial court carefully analyzed the evidence sought to be admitted to be sure it's substantial probative value outweighed its "substantial prejudicial effect." (See *People* v. *Ewoldt, supra,* 7 Cal.4th at p. 404, citing *People* v. *Thompson* (1980) 27 Cal.3d 303, 318 [165 Cal.Rptr. 289, 611 P.2d 883].) As noted above, the court limited the scope of the other evidence as well as admonishing the jury several times about its limited purpose and permissible use. The accounts by both East and McLaen were independent of each other and that of Gonzales, and had already resulted in criminal convictions, thus reducing the risk of punishing Brandon for those earlier acts in this case and causing the jury confusion. (See *People* v. *Ewoldt, supra,* 7 Cal.4th at pp. 404-405.)

Moreover, even assuming Brandon had conceded he was the person in the car with Gonzales, his conduct in the car would not have undisputedly shown he intended to rob Gonzales, as noted above. (*People* v. *Ewoldt, supra,* 7 Cal.4th at p. 406.) Thus considering all of the circumstances, we conclude the trial court did not prejudicially err in admitting the evidence of Brandon's prior criminal acts.

---

[12]Contrary to the defense position that "intent" was not at issue in this case because his defenses were mistaken identity and alibi, he did not concede at trial the elements of the offenses charged and even brought three dismissal motions on grounds the specific intent to rob had not been shown by the prosecution. As our Supreme Court noted in *People* v. *Daniels* (1991) 52 Cal.3d 815, 857-858 [277 Cal.Rptr. 122, 802 P.2d 906]: "[A] defendant's plea [of not guilty] does put the elements of the crime in issue for the purpose of deciding the admissibility of evidence [of uncharged crimes] under Evidence Code section 1101, unless the defendant has taken some action to narrow the prosecution's burden of proof." (Fns. omitted.) The record reflects Brandon did not take such action at trial.

II

*Identification Evidence*

Brandon raises four arguments in challenging the identification evidence in this case: (1) That the trial court abused its discretion in admitting Gonzales's photographic identification of him because it was the result of an impermissibly suggestive photographic spread in violation of *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967] (*Simmons*); (2) the overly suggestive procedure employed during the photographic lineup tainted Gonzales's subsequent in-court identifications; (3) the admission of Gonzales's impermissively suggestive photographic and tainted in-court identifications were prejudicial because there was no corroborating physical evidence that tied him to the crime; and 4) the trial court compounded the above errors by excluding evidence of the results of his expert witness's case specific identification experiment. None of these contentions has merit.

*In limine* the defense brought a motion to exclude the photographic spread shown to Gonzales for purposes of identifying him on grounds that under *Simmons* such array was unduly suggestive since only two other photographs in the lineup were of men who looked "similar" to him. The court viewed the exhibit, which included five photographs, and noted it might not have included photograph Nos. 2 and 4 which stood out a bit, but observed that Nos. 1, 3 and 5 were so similar that it found nothing unfair with the photographic lineup. The court therefore denied the motion to exclude, stating the exhibit would be admitted and counsel could argue as to its weight.

Also *in limine*, the court tentatively ruled the defense eyewitness expert could present testimony on the various factors concerning identification, but could not give an opinion as to the accuracy of the identifications made in this case based on the photographic array.

After the prosecution rested, the court again denied a renewed defense motion to suppress the photographic lineup on grounds of its suggestibility. Defense counsel then posited the idea Brandon's eyewitness expert be able to testify about an experiment he conducted using the photographs in the objected to photographic lineup exhibit. The court tentatively ruled the expert would not be allowed to use the exhibit to opine about any disparities.

Later, before the expert was called to testify in the defense case, defense counsel yet again renewed his motion to suppress the photographic lineup as unduly suggestive and moved to suppress (and strike) Gonzales's in-court identification based on that earlier identification. Defense counsel also made an offer of proof that the expert, who had conducted a "mock" lineup,[13] would testify about that lineup experiment and its results and conclude the lineup exhibit in this case was not neutral. The court denied both motions to suppress, and stated: "The motion to allow the [mock lineup] data is also denied. [] Basically what it amounts to is the witness is endeavoring to establish by a sampling of persons who had been advised of a commission of a crime and the description of the perpetrator to see how they react to a photo lineup is, in essence, trying to create by test tube situation that bears no relationship to the actual events. [¶] What, in fact, occurred by re-creation and saying if we sample enough people we can determine the accuracy and the suggestiveness of that lineup, [but] there's one great fault and that is none of those . . . people in the sample ever saw the perpetrator of this offense, and the fact . . . that the witness can determine that there are perhaps a couple of photos in the spread that stand out is nothing more than the jury may conclude on its own. [¶] In fact, his testimony would be limited to the fact that if there are photos that do stand out that are easy to eliminate, it can effectively reduce the number of choices to the victim. That's about the extent of it. . . ."

■■■ On appeal, Brandon contends these various rulings were in error. Not so.

■■ Concerning the pretrial photographic lineup in question, a violation of due process only occurs " 'if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [Citations.] "Whether due process has been violated depends on 'the totality of the circumstances' surrounding the confrontation.[14] [Citation.]" The burden is on the defendant to show that the identification procedure resulted in such unfairness that it abridged his rights to due process. [Citation.]' [Citations.]" (*People* v. *Sanders* (1990) 51 Cal.3d 471, 508 [273 Cal.Rptr. 537, 797 P.2d 561].)

---

[13]The expert had given a number of Caucasian and Hispanic women the verbal description of the suspect Gonzales had given to the police. He then had each look at the photographic lineup exhibit used in this case and give an opinion as to who the perpetrator was. From these results he then determined the percentage of suspect picks for each photograph in the array.

[14]In reviewing all the circumstances in determining whether an identification procedure was unconstitutionally suggestive, we resolve all evidentiary conflicts in favor of the trial court's findings on such and uphold them if there is substantial evidence to support them. (*People* v. *Perkins* (1986) 184 Cal.App.3d 583, 588-589 [229 Cal.Rptr. 219].)

Generally, a pretrial procedure will only be deemed unfair if it suggests in advance of a witness's identification the identity of the person suspected by the police. (*People* v. *Hunt* (1977) 19 Cal.3d 888, 893 [140 Cal.Rptr. 651, 568 P.2d 376].) However, there is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance. (*People* v. *Wimberly* (1992) 5 Cal.App.4th 773, 790 [7 Cal.Rptr.2d 152].) Nor is the validity of a photographic lineup considered unconstitutional simply where one suspect's photograph is much more distinguishable from the others in the lineup. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1215-1218 [14 Cal.Rptr.2d 702, 842 P.2d 1] [where the defendant was the only person in jail clothing]; *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1222 [9 Cal.Rptr.2d 628, 831 P.2d 1210] [where the defendant was the only man in a red shirt].)

 As the trial court noted, Brandon's photograph does not stand out as the sole possible or most distinguishable choice.[15] It is very similar to at least two other men's photographs. The circumstances surrounding the photographs being shown to Gonzales (loose, in a stack and shown one at a time) reflect she was not influenced by any so-called "filler" photographs. She immediately recognized Brandon as the man who attacked her and her trial testimony reflects she had ample time to see Brandon's face and observe him throughout the duration of the criminal acts against her. Based on the totality of the circumstances, we conclude Brandon has not met his burden of proving the photographic lineup was unfair and unduly suggestive.[16]

Having so determined, his contentions concerning the tainted in-court identifications, at the preliminary hearing and at the trial, also fall. (See *People* v. *Suttle* (1979) 90 Cal.App.3d 572, 580 [153 Cal.Rptr. 409].) The trial court properly did not suppress the photographic array or Gonzales's in-court identifications.

 The trial court also properly ruled Brandon's expert could not introduce into evidence the mock lineup experiment he conducted with the

---

[15]We have taken judicial notice of the photographic lineup used in this case. (Evid. Code, § 459, subd. (a).)

[16]Brandon complains the photographic lineup was unduly suggestive because the police unfairly used that procedure rather than a live lineup which could have been conducted since he was in custody. Although not fully explained, the record reflects Brandon, a parolee, was in custody at Donovan State prison, or in the process of being housed there pending trial. Such may have been a reason for not having a lineup due to the logistics and transportation problems involved in getting him from Donovan to the downtown jail viewing area. Regardless, there is no constitutional requirement that a live lineup be conducted in any particular case.

photographic array in this case nor testify about its results or opine about its bias. ■ Concerning the exclusion of eyewitness expert evidence and testimony, the fundamental rule is: "When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].)

■ Here, the trial court did not fully exclude the eyewitness expert's testimony, only that portion relating to this specific mock lineup experiment and how it affects this case. Such was a proper exclusion as the matter dealt with the fair selection of persons in a lineup, which is a matter likely "to be fully known to or understood by the jury." The similarity in appearance of members of a photographic lineup, and the weight to be accorded such, are matters completely within the province of the trier of fact to resolve. Moreover, as the trial court noted, the results of the expert's experiment were irrelevant to the issue of whether Gonzales was accurate in her identification of Brandon as her abductor and robber.[17] Boiled down, admission of evidence of the mock lineup experiment would not have provided the jurors with anything that was not within their own "expertise." (See *People* v. *Wright* (1988) 45 Cal.3d 1126, 1141 [248 Cal.Rptr. 600, 755 P.2d 1049].) The court thus properly limited the expert's testimony to general factors that might have affected the accuracy of Gonzales's eyewitness identification and excluded the mock lineup experiment.[18]

III

*CALJIC No. 2.21.2**

. . . . . . . . . . . . . . . . . . . . . . . . .

[17]A trial court has wide discretion in determining whether evidence is relevant. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) Here the expert himself noted during his evidentiary hearing that the experiment was "not a test of accuracy of a correct identification[, rather it was only] a scientific test used in the field to determine the number of functionally similar alternates." He further noted that the women in the study were "not associated or percipient in any way."

[18]The trial court's denial of Brandon's new trial motion based on this same evidentiary ground was also proper.

*See footnote, *ante*, page 1033.

IV

*Dual Enhancements*

 Brandon finally contends the trial court erred in imposing enhancements for both section 667.5, subdivision (a) (a three-year enhancement for a prior prison term for a violent felony conviction) and section 667, subdivision (a) (a five-year enhancement for a prior serious felony conviction) in this case because both were based upon his 1987 conviction for which he served five years four months in prison. Brandon argues such dual use of enhancements contention is not waived by his counsel's lack of objection at sentencing, and *People* v. *Jones* (1993) 5 Cal.4th 1142 [22 Cal.Rptr.2d 753, 857 P.2d 1163] mandates the lesser three-year enhancement under section 667.5, subdivision (a) be stricken. We disagree.

Preliminarily, we note that although the California Supreme Court has recently adopted a sentencing waiver rule which also applies to a lack of objection at sentencing to the dual use of factors to enhance a prison term (*People* v. *Scott* (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040]), such is not applicable to this case because the rule is not retroactive. (*Id.* at pp. 357-358.)

 We also comment on Brandon's assertion the imposition of the enhancement under section 667.5, subdivision (a), without the trial court explicitly finding it true after the court trial, is somehow an illegal, unauthorized sentence. Although the court did not so expressly find true the subject enhancement at that time, as it did the other two alleged priors, such is not fatal to the imposition of its punishment in this case. Contrary to the situation facing the court in *People* v. *Anthony* (1986) 185 Cal.App.3d 1114, 1125 [230 Cal.Rptr. 268], where the court's oral pronouncement of judgment was silent as to any findings on the enhancement allegations pled there, the transcript of the sentencing hearing here shows the court specifically stated the enhancement under section 667.5, subdivision (a), pertaining to the violent prior conviction, "has been pleaded and proven." A reading of the transcript of the court trial concerning the matter supports this conclusion.

At that court trial, the prosecutor explained the heading for the section 667.5, subdivision (a) violent prior was incorrect and it should be entitled "FIRST VIOLENT PRISON PRIOR." She also pointed out that the first prison prior and the "first violent prison prior" each referred to the same period of

commitment which was comprised of separate convictions for kidnapping with a firearm and three armed robberies,[22] an assault on a police officer, and a revoked probation for felony drunk driving. She provided evidence of the prison packets showing each of the convictions making up Brandon's earlier prison commitment. After reviewing the packets, the court found true the alleged first prison prior pursuant to section 667.5, subdivision (b) and the first felony prior pursuant to section 667, subdivision (a). Because the true finding on the first prison prior enhancement was comprised of the same commitment as the section 667.5, subdivision (a), prior violent prison prior enhancement, we construe the record as showing the trial court also impliedly found that pleaded enhancement true at the same time. Brandon therefore cannot complain the imposition of such term was not properly supported by an allegation which was pleaded and proven to the trial court.

Turning to the crux of Brandon's sentencing contention, that imposition of both a three-year enhancement under section 667.5, subdivision (a) and a five-year enhancement under section 667, subdivision (a) is prohibited by *People* v. *Jones, supra,* 5 Cal.4th 1142, we find *Jones* inapposite. *Jones* precluded imposition of both enhancements for a one-offense commitment. (*Id.* at p. 1153.) Here, both the prison prior and prior serious felony enhancements referred to multiple offenses. Although they each referred to the same armed kidnapping and armed robbery offenses, either one would provide a sufficient basis in and of itself to support either enhancement. As we have recently determined, *Jones* does not preclude such allegation case-splitting "when the prior prison term is based *in part* on the same case that also is the basis for imposition of [another prior conviction enhancement], and based *in part* on a separate, independent case[.]" (*People* v. *Gonzales* (1993) 20 Cal.App.4th 1607, 1610 [25 Cal.Rptr.2d 305], original italics; see also *People* v. *Wiley* (1994) 25 Cal.App.4th 159, 164 [30 Cal.Rptr.2d 701].) Because the record evidences the court's intention to impose the full possible punishment for Brandon's crime and recidivist behavior without dual use of the enhancement, i.e., striking the one-year prison prior enhancement in lieu of imposition of the three-year prison prior, and because the prosecutor specifically referred to splitting the priors where necessary to ensure no such dual use in her statement in aggravation, we presume, in the absence of a showing otherwise, the sentencing court did just that. (Evid. Code, § 644.) Since this case falls under the ambit of *Gonzales* and Brandon would not suffer two enhancements for the same underlying offense, his contention is rejected.

---

[22]The information only "pleaded" these, however, as part of the prison priors alleged under section 667.5, subdivision (b).

## Disposition

The judgment is affirmed.

Froehlich, J., and Nares, J., concurred.

A petition for a rehearing was denied February 22, 1995, and appellant's petition for review by the Supreme Court was denied May 10, 1995.