Filed 4/30/14  P. v. Armstrong CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

THE PEOPLE,

    Plaintiff and Respondent,

    v.

RONALD GENE ARMSTRONG, III,

    Defendant and Appellant.

_____/

A136112

(Contra Costa County
Super. Ct. No. 1107721)

A jury convicted appellant Ronald Gene Armstrong, III, of attempted first degree murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a))[1] and carjacking (§ 215, subd. (a)) and found true various sentencing enhancements.  The trial court sentenced him to state prison.

Appellant appeals.  He contends the trial court erred by: (1) excluding third party culpability evidence that "the victim was in a gang, and had enemies who were trying to kill him;" and (2) refusing to suppress a witness's pretrial and in-court identification.

We affirm.

---

[1]    Unless otherwise noted, all further statutory references are to the Penal Code.

1

*Prosecution Evidence*

In February 2011, Christina Ulloa drove a friend's green Acura to a Richmond shopping center with her ex-boyfriend, Deaundre Alexander. After Alexander purchased a hat, he and Ulloa left the mall through the Macy's store. Ulloa drove the Acura and Alexander rode in the front passenger seat. Ulloa stopped at a red light at the intersection of Hilltop and Research Drive. She heard a window break and about eight gunshots. Ulloa "put [her] head down" and could not see anything. Alexander said, "I'm shot" and Ulloa "step[ped] on the gas[.]" As she tried to make a U-turn, Ulloa crashed into a pole. Emergency personnel arrived and removed Alexander from the car.

A Richmond police officer went to the scene of the accident and saw gunshot wounds on the right side of Alexander's chest and found eight .40 caliber casings on Hilltop Drive. Later that day, another police officer met with Roberto Quesada — a friend of appellant's — who "appeared shaken." Quesada told the officer "he had just been carjacked and that the vehicle that he had been in was also involved in a shooting." The officer interviewed Quesada at the police station and recorded the interview. Quesada was wearing a gray hooded sweatshirt over a black hooded sweatshirt and a black puffy vest over both sweatshirts. He was also wearing dark jeans.

Quesada worked and socialized with appellant. Quesada lived near appellant and sometimes drove him to work in a Dodge Durango. On the day of the incident, Quesada picked appellant up at work in the Durango. Appellant drove the SUV to his cousin's house because Quesada did not have a driver's license. Appellant and Quesada smoked marijuana at appellant's cousin's house; then appellant drove the Durango to the shopping center so appellant and Quesada could buy new Nikes.

Appellant parked the car in the mall parking lot. Quesada, however, decided not to go into the shopping center because he did not have enough money to buy new shoes. Appellant gave Quesada the car keys and Quesada returned to the car and listened to music while appellant went into the mall. When appellant went into the mall, he was

2

wearing a black hooded sweatshirt but the hood was not on his head. About 15 or 20 minutes later, appellant called and asked Quesada to pick him up at Macy's. Quesada drove to Macy's and saw appellant "sitting slouched over" on a bench; the hood on his sweatshirt was up. Appellant jumped into the passenger seat of the car and directed Quesada to "follow that green car." The normally talkative and happy appellant was "serious" and "slouched over in . . . a mysterious way." Quesada thought appellant's demeanor was "odd" but Quesada followed the green car.

The green car stopped at a red light at the intersection of Hilltop and Research Drive and Quesada stopped behind it. Quesada saw a girl in the driver's seat and a man in the passenger seat. Appellant jumped out of the Durango and went to the passenger side of the green car. He had a gun in his hand and the hood of his sweatshirt was up. Quesada watched appellant fire five shots at the passenger in the green car. Quesada was scared — he "never thought [appellant] would do something like [that]." Appellant ran back to the Durango with the gun in his hand and jumped into the passenger side. Appellant pointed the gun in Quesada's direction and told him to drive. Quesada complied because the gun was pointed at him; he tried to pull over and get out of the car but appellant grabbed the steering wheel. Quesada eventually gained control of the steering wheel and pulled the Durango into a parking lot. Then appellant pointed the gun at Quesada and told him to get out of the car. Quesada complied but left his phone in the car. Appellant drove away.[2]

Quesada walked to a gas station and called his wife from a borrowed cell phone. When she came to the gas station, Quesada told her he had been carjacked and used her phone to call the police.[3] The police arrested Quesada because his car had been seen at

---

[2]    A woman saw the Durango enter the parking lot. She saw someone in the driver's seat jump into the backseat of the car and saw Quesada — whom she knew — come out of the passenger side of the car. Then she saw a person in the driver's seat drive the Durango out of the parking lot.

[3]    Quesada's wife testified he called her and said "the car had been taken and he needed [her] to come pick him up from the gas station." Quesada's wife went to the gas station and saw Quesada crying, which was unusual. Quesada told his wife appellant had

3

the scene of the shooting. At the police station, Quesada told the police what happened and explained a surveillance videotape would show he picked up appellant outside of Macy's. The Macy's surveillance video showed appellant getting into the passenger side of the Durango. The police released Quesada.

On the day of the incident, L. Battee was stopped at a red light directly behind the Durango at the intersection of Hilltop and Research Drive. Battee heard "[m]ore than three" gunshots and saw a man get into the passenger side of the Durango. He was wearing a hooded sweatshirt or sweat jacket and the hood was up. The man had an "angry look" on his face. Battee saw the Durango speed away and the green car crash into a pole. At the police station later that evening, Battee saw Quesada and determined he was not the person she saw getting back into the Durango. Later, Battee reviewed a photographic lineup and identified appellant. She noted appellant had the same angry look on the day of the shooting as he did in the picture in the photo array. At trial, Battee identified appellant.

### Defense Evidence

Appellant testified he worked and socialized with Quesada. On the day of the incident, appellant was wearing a black North Face coat and a black Polo sweatshirt with a hood. Appellant finished his shift at work, left the building, and saw Quesada in the parking lot, sitting in the passenger seat of the Durango. Quesada was wearing a gray pullover sweater. A man named Jay — who was wearing a grey hooded sweatshirt — was in the backseat of the car. Appellant drove the Durango to his friend's house, where he and Quesada smoked marijuana. Jay stayed in the car.[4]

---

carjacked him and repeatedly said "he shot him, he shot him." Quesada used his wife's phone to call the police. A Richmond police officer confirmed Quesada's wife received a phone call from a phone loaned to Quesada and that Quesada called 911 from his wife's phone.

[4] A friend of appellant's testified appellant came to his house that day with two men, both of whom wore dark-colored hooded sweatshirts. Appellant and one man came inside and smoked marijuana while the other man stayed in the car.

Then the three men went to the shopping center so appellant and Quesada could buy new shoes. Appellant went into the mall to buy the shoes and Quesada and Jay stayed in the car. Appellant was unable to purchase the shoes, so he called Quesada, who offered to pick him up outside of Macy's. Appellant got into passenger seat of the Durango and began to take off his North Face jacket. At that point, Jay — who was sitting in the backseat — said, "follow that green car." Jay also said, "let me see your jacket."

As appellant turned around to look at Jay, he saw a small black handgun in Jay's lap. Appellant did not have a gun and was "puzzled" that Jay had one. Appellant gave Jay his coat and Quesada followed the green car. At the first stoplight, appellant got out of the car because he was concerned about the gun and the way Jay was looking at the green car. As appellant walked away from the car, he heard gunshots and ran toward a gas station. He called Quesada to "see if he was okay" and to "ask him what happened[.]" Quesada did not answer the phone and appellant went home. Appellant did not go to work the next few days because of family obligations. He eventually learned there was a warrant for his arrest and, about 20 days later, he surrendered. He did not shoot at the green Acura. Appellant claimed Quesada "threw [him] under the bus[.]"

Appellant had "heard of" Alexander by his nickname or street name, "D'Alex." He conceded the Macy's surveillance video showed Ulloa and Alexander leaving Macy's a few seconds before he appeared in the video looking out the exit doors, but he denied seeing Alexander in Macy's. According to appellant, Alexander was a suspect in the 2009 murder of one of appellant's friends, Devon Johnson. Appellant did not think Alexander shot Johnson, however.[5] Several witnesses testified to appellant's good character.

---

[5] On rebuttal, a Richmond police detective testified Alexander and Ulloa were suspects in Johnson's murder. The police arrested Alexander and Ulloa but later released them.

5

***Verdict and Sentencing***

A jury convicted appellant of attempted first degree murder (§§ 187, subd. (a), 664, subd. (a)) and carjacking (§ 215, subd. (a)). The jury found the sentencing enhancements true and the court sentenced appellant to 25 years to life in state prison.

DISCUSSION

Appellant challenges the court's exclusion of third-party culpability evidence and claims the impermissibly suggestive pretrial identification procedure violated his due process rights.

I.

*The Court Did Not Abuse Its Discretion by Excluding Third Party*
*Culpability Evidence and Any Error Was Harmless*

Before trial, appellant sought to introduce the following third party culpability evidence: (1) Alexander was a member of Parchester Village, a Richmond street gang; (2) the Parchester Village's enemies include the Main Line Boyz; (3) shots were fired at Alexander's residence in April 2011 and a number of people pled guilty to "charges having to do with the conspiracy to shoot and the shooting;" (4) Alexander was shot and wounded in May 2011; and (5) Alexander was "in custody for . . . possession of an assault rifle and possession of a Glock" and told the arresting officer he "had those weapons because people were trying to kill him and he wanted to protect himself."

Appellant argued evidence of third party culpability was relevant because it could raise a reasonable doubt about his guilt. As defense counsel explained, evidence of third party culpability "should be heard by the jury. [¶] And that this is especially so, if in fact there is evidence that . . . was produced or adduced at this trial that there were more than two people in that car, that there was in fact a third person in the car. And at least one witness testified . . . at the preliminary hearing that she believed that there were at least two, possibly three persons in the car at the time that she saw the . . . Durango." Appellant's position was "there was another person in that car who did the shooting who may or may not have had gang affiliation . . . because Mr. Alexander was involved in gang activity and was the victim of shootings subsequent to this [incident] . . . and

6

possessed a weapon subsequent to this to protect his life because he thought people were after him, . . . a reasonable doubt could be raised in the mind of the jury if evidence of third party culpability is permitted[.]"

The prosecution opposed the motion and the court excluded the evidence. The court determined there was "no basis to infer" Alexander's alleged gang membership "had anything to do with the shooting on this occasion[.]" As the court explained, "I don't think Mr. Alexander's membership or association, assuming it's true, with Parchester Village permits evidence of that association or membership in itself because it doesn't connect any individual or any alleged third party to the crime involved here. In other words, there is no . . . circumstantial evidence linking the third party, that is the people in the car, to the membership Mr. Alexander allegedly has in Parchester Village." The court explained, "absent further evidence connecting the alleged third party to a motive relating to the gang membership, I don't think under [Evidence Code section] 352 that Mr. Alexander's gang membership is relevant or probative and I don't think it would raise a reasonable doubt because at most it provides theoretical motive to enumerable people, but it doesn't connect any third party in this case[.]" [6]

On appeal, appellant contends the court erred by excluding evidence that Alexander "was in a gang, had enemies, and carried weapons because people were trying to kill him, and that unknown persons had previously shot at his house and had shot him personally." "'[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt . . . must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.'"

---

[6]     During trial, appellant renewed his motion. The court asked defense counsel, "is there any evidence . . . that the people who committed the shooting at the house in April 2011, who shot him in the leg on May of 2011 . . . any evidence that any of those suspected third parties were involved in the present events?" Counsel responded, "No[.]" The court denied the renewed motion.

7

(*People v. Elliott* (2012) 53 Cal.4th 535, 580, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1325 (*Bradford*).) We review the exclusion of third party culpability evidence for abuse of discretion. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1261 (*Gonzales*).)

The court did not err by excluding the proffered evidence. As our high court has explained, "[e]vidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant. But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime." (*People v. Brady* (2010) 50 Cal.4th 547, 558 (*Brady*).)

Here, appellant testified Jay was the shooter and there were three people in the Durango during the shooting. But as defense counsel conceded in the trial court, there was no evidence linking Jay to any gang affiliation, nor any evidence linking Jay to the 2011 shootings. Numerous courts have excluded evidence of third party culpability where — as here — "the proffered evidence suggested no link between the third parties and the actual perpetration of" the crimes. (*Brady, supra,* 50 Cal.4th at p. 558; *People v. Linton* (2013) 56 Cal.4th 1146, 1202 [nothing connected the "unidentified nighttime intruder" into the victim's home "years earlier" with the assault].) That Alexander was the victim of earlier shootings and feared unidentified third parties suggests only that another person may have had "motive or opportunity to commit the crime[.]" (*Brady*, *supra*, 50 Cal.4th at p. 558.) Without more, that motive or opportunity "'will not suffice to raise raise a reasonable doubt about a defendant's guilt[.]'" (*People v. Sandoval* (1992) 4 Cal.4th 155, 176, quoting *People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)

Assuming for the sake of argument the court erred by excluding the third party culpability evidence, any error was harmless because it is not "reasonably probable that a result more favorable to [appellant] would have been reached in the absence of the error. [Citation.]" (*Hall, supra,* 41 Cal.3d at p. 836 [erroneous exclusion of third party culpability evidence was harmless].) The evidence against appellant was strong: a

8

surveillance video showed appellant leaving Macy's just after Alexander and Ulloa and wearing clothing matching the shooter's description. Quesada and Battee identified appellant as the shooter and a third witness corroborated Quesada's testimony about driving the Durango to the parking lot and getting out of the car. The proffered evidence would not have affected the verdict. (*Bradford*, *supra*, 15 Cal.4th at p. 1325 [exclusion of third party culpability evidence harmless "[i]n light of the extremely strong evidence against defendant"]; *People v. Earp* (1999) 20 Cal.4th 826, 878.)

Finally, we reject appellant's claim that the exclusion of the proffered evidence deprived him of an opportunity to present a complete defense and violated his due process rights. "[T]he exclusion of weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights." (*Gonzales, supra,* 54 Cal.4th at p. 1261.) Here, the court permitted appellant to testify Jay was the shooter, and that there were three people in the car during the shooting. The exclusion of the proffered evidence — where appellant failed to establish a connection between that evidence and the shooting in this case — did not violate appellant's constitutional rights.

## II.

### *The Court Did Not Err in Denying Appellant's Motion to Suppress the Pretrial and In-Court Identification*

#### A. Appellant's Motion to Suppress Battee's Identification

Appellant moved to suppress Battee's pretrial and in-court identification as "unduly suggestive." At a hearing on the motion, Richmond Police Detective Eric Haupt testified he met with Battee about a week after the shooting. She said her car was stopped behind the Durango and she saw a man "go into the right side of it after the shooting." Battee described the man as a Hispanic or light-skinned African American with facial hair. She said the man was wearing a hooded sweatshirt "and the hood was up and over [the man's] head." Battee told Detective Haupt the man looked at her with a "malicious look on his face[.]" Battee also told Detective Haupt she saw Quesada on the night of the shooting at the police station and "dismissed him as the [ ] suspect because he was too heavy." She also said the man she saw at the shooting had a slender build.

9

Detective Haupt created a photo lineup with appellant and five other men of similar appearance.  When he prepared the lineup, he knew appellant was a suspect. Appellant's photograph was in position three.  Before showing Battee the lineup, Detective Haupt admonished her that the suspect's photograph may or may not be in the lineup and Battee signed and dated the admonishment.  Battee immediately eliminated photographs one and two.

Detective Haupt did not ask Battee to eliminate photographs that did not look like the suspect, nor did he gesture to her or point to the lineup while she looked at it.  He "just [sat] back in [his] chair during the whole process and just kind of watch[ed]." Battee's hand "slid across the paper to . . . the photograph in number 3, and she stalled there for awhile."  Then Battee looked at photographs four, five, and six and "kind of pushed the paper from her and then sat up[.]"  At that point, Detective Haupt thought Battee "was done" looking at the photographs, so he "asked her did anybody in those photographs look most like the person she saw at the shooting scene."  She said, the "third photograph[.]"  When Detective Haupt asked her what about the third picture looked like the shooter, Battee said "it was primarily based on the skin tone[.]"  She also said the person in photograph number three had "bushier eyebrows" than the men in the other photographs.  Detective Haupt did not ask Battee to circle appellant's picture or the number of the photograph because he did not feel Battee made a positive identification. Detective Haupt testified he did not suggest to Battee what photograph to select.

Battee testified at the hearing on the motion to suppress her identification.  She stated she saw a Hispanic or light-skinned African American man get into the Durango. The man was wearing a blue or grey hooded sweatshirt with the hood up, preventing her from observing his hair.  She noticed the man had "[a] little bit of facial hair[.]"  Battee made eye contact with the man, and he had an "angry look."  On the night of the shooting, she went to the Richmond Police Department.  She determined Quesada was not the person she saw on the day of the shooting because the shooter was thinner. Before looking at the photo array, Battee read an admonition.  She looked at the

10

photographs and told Detective Haupt the man in photograph three looked like the man she saw but he "had too much facial hair."

After she testified at the hearing, Battee told the prosecutor appellant "had the same mean face as he had during the time of the shooting." The prosecutor responded, "so you saw the same look?" and Battee said, "yes, absolutely." At that point, the prosecutor showed Battee the Macy's surveillance video, which Battee had not seen. Without being told anything about the video, Battee "identified the person in the video as being the person that she saw outside the car. Again, basing her identification on the mean look and the complexion of the face."

The court reviewed the photo lineup and the admonishment Battee signed. The court also listened to an audiotape of Detective Haupt's interview with Battee. At the conclusion of the hearing, the court denied appellant's motion to suppress "the photo spread identification or any in-court identification or description" by Battee. In a lengthy ruling, the court determined both Detective Haupt and Battee were credible witnesses. After reciting the evidence and the relevant factors, the court determined appellant had not met his "burden of proof that the identification procedure used in this case was unduly suggestive."

B.     Battee's Identification Was Not the Result of an Impermissibly Suggestive Procedure

Appellant contends the identification procedure was "impermissibly suggestive." To determine ""whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances. . . ." [Citation.]'" (*People v. Thomas* (2012) 54 Cal.4th 908, 930-931 (*Thomas*).) "The burden is on the defendant to show that the identification procedure resulted in such unfairness that it abridged his rights to due process. [Citations.]'" (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1051 (*Brandon*), quoting *People v. Sanders* (1990) 51 Cal.3d 471, 508.) "We review deferentially the trial court's findings of historical fact, especially those that turn on

11

credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." [Citation.] "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." [Citation.]'" (*Thomas, supra,* 54 Cal.4th at pp. 930-931.)

Appellant contends the identification procedure was impermissibly suggestive because Detective Haupt: (1) knew appellant was a suspect when he prepared the photo lineup and showed it to Battee; (2) "impermissibly influenced" Battee by asking her who most resembled the suspect; and (3) showed all of the photographs to Battee "all at once, thus creating the danger of comparison shopping[.]" We conclude the court did not err in denying appellant's motion to suppress Battee's pretrial and in-court identification.

"Generally, a pretrial procedure will only be deemed unfair if it suggests in advance of a witness's identification the identity of the person suspected by the police." (*Brandon, supra,* 32 Cal.App.4th at p. 1052.) As our high court has explained, the defendant bears the burden of showing an identification procedure was unduly suggestive and unfair "as a *demonstrable reality, not just speculation.*" (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222, italics added.) Appellant's assertion that the lineup was somehow suggestive because Detective Haupt knew appellant was a suspect is illogical. Had the other men in the lineup not been physically similar to appellant, he would have complained he stood out. We have examined the lineup and do not find it unduly suggestive. The men in the photographs are of similar race and build and are standing before the same blue background. Nothing in the photographs calls attention to appellant's eyes, and appellant does not claim his eyebrows made his photograph stand out from the other photographs in the lineup. (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1082.)

Appellant's next claim, that Detective Haupt influenced Battee by asking her whether anyone in the photographs "look[ed] most like the person she saw at the shooting scene" is equally unpersuasive. We have listened to the audiotape of Battee's interview with Detective Haupt. Detective Haupt admonished Battee before showing her the photo

12

array. His question was neutral and did not suggest a particular photograph should be selected. Moreover, there is no evidence or authority supporting appellant's claim that Detective Haupt's question "may . . . have unconsciously or unintentionally suggested to [Battee] that he believed . . . appellant, was the suspect."

We also reject appellant's claim — unsupported by any authority — that multi-photo lineups are inherently impermissibly suggestive. Courts have held a single photo lineup is not inherently unfair (*People v. Ochoa* (1998) 19 Cal.4th 353, 413) and have rejected claims that "group lineups are inherently impermissibly suggestive[.]" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 272 (*Johnson*).) Courts have also upheld five-person photo arrays. (*Brandon, supra,* 32 Cal.App.4th at p. 1050.) Contrary to appellant's suggestion, California law does not require "sequential, as opposed to simultaneous, presentation" of photographs. (Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2013) § 22.15, p. 575.)

Appellant's argument that Battee's in-court identification was tainted because the prosecutor showed her the Macy's surveillance video before she testified at trial has no merit. Courts have approved of pretrial identifications where law enforcement showed a witness surveillance video before showing the witness a photo lineup. (*Johnson, supra,* 183 Cal.App.4th at p. 273; *People v. Hernandez* (1988) 204 Cal.App.3d 639.) Here, the prosecutor showed Battee the surveillance video after she identified appellant's photo at the police station. That Battee saw the surveillance video before identifying appellant at trial does not alter our conclusion. "'[T]he fact that defendant alone appeared in both a photo lineup and a subsequent live lineup does not per se violate due process.' [Citation.]" (*Johnson, supra,* 183 Cal.App.4th at p. 272.)

Having reached this result, we need not determine whether Battee's identification was reliable under the totality of the circumstances. (*People v. Carter* (2005) 36 Cal.4th 1114, 1164.) We conclude the court properly declined to suppress Battee's pretrial and in-court identification.

13

DISPOSITION

The judgment is affirmed.

                                        _____

                                        Jones, P.J.

We concur:

_____

Needham, J.

_____

Bruiniers, J.