Filed 8/12/14  In re E.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E.S., a Person Coming Under the Juvenile Court Law. | D065689 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ003767) |
| v. | |
| E.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Gary Bubis, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Tilisha Martin for Minor.

Defendant and appellant E.S. (father) appeals the juvenile court's order from the contested jurisdictional/dispositional hearing that it would be detrimental to place then one-year-old E.S. (minor) with him pursuant to Welfare and Institutions Code[1] section 361.2, subdivision (a). Father alternatively contends the court erred when it refused to place minor with minor's paternal grandmother. Affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and respondent San Diego County Health and Human Services Agency (agency)[2] on January 23, 2014 filed a petition under section 300, subdivision (e) (petition) on behalf of minor after agency received a referral from a child abuse hotline on January 17, 2013 alleging physical abuse of minor. The petition alleged that minor "suffered severe physical abuse, including multiple extensive bruises to her face consistent with forceful grabbing, [hair loss] on the top of her scalp consistent with forceful grabbing, a skull fracture with soft tissue swelling and two round circular scars

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     Pursuant to California Rules of Court, rule 8.200(a)(5), minor's counsel submitted an informal letter brief joining the arguments and position of the agency.

2

to her right shoulder from a previous bruising injury inflicted by her parent or by a person the parent reasonably should have known was inflicting the injuries . . . ."

Agency's January 23, 2014 detention report noted an agency social worker responded to minor's home, observed minor's injuries and instructed minor's mother, C.S. (mother),[3] to take minor to Rady Children's Hospital (Rady's) for examination. An examining physician from Rady's concluded minor's injuries were concerning for inflicted injury and, as a result, minor was taken into protective custody on January 17, 2014. Minor was examined the following day by a child abuse expert who also concluded minor's injuries were nonaccidental.

The January 23 detention report included an in-person interview of mother's boyfriend, J.H. (boyfriend), who had been caring for minor over the last couple of months while mother was working. Boyfriend reported minor received the bruises to her face a week earlier when they were playing a "'chasing game,'" and minor lost her balance, fell forward and hit her forehead on the left side of a wood dresser. In response to how minor received the bruises to her shoulder and chin, boyfriend responded that about a week earlier minor had incorrectly put on boyfriend's shirt, which had two snaps at the top of the collar, and that the snaps caused the bruising when they pressed against minor's shoulder; with regard to the bruises on the chin, boyfriend reported that minor received them when she rested her chin on the top of a wooden crib and/or when she was in her (padded) playpen.

---

3      Mother is not a party to this appeal.

3

Boyfriend denied hitting or spanking minor and stated he used timeouts to discipline minor. When asked by agency social worker Maria Araiza about concerns expressed by neighbors over minor's welfare, boyfriend dismissed them and stated that one of the neighbors "'ha[d] a thing for [mother]'" and spoke to mother "'for comfort.'"

Araiza interviewed the neighbor. He reported that about a month earlier he noticed a "knot" on minor's head. At that time, mother told the neighbor that minor had fallen off a table. However, when the neighbor subsequently saw pictures taken by another neighbor showing bruises on minor's face, he became concerned. Thus, on January 16, 2014 when he heard minor crying, the neighbor went to the apartment of mother and boyfriend, found the door open and saw boyfriend drying off minor on the living room floor after bathing minor. The neighbor reported minor was on her back. He next saw boyfriend "grab[] [minor] by the ankles and flip[] her over causing [minor] to land on her face." The neighbor also heard boyfriend using "foul" language toward minor. The neighbor notified mother of this incident.

The detention report included several in-person interviews of mother. Mother identified defendant and appellant E.S. as minor's father. Mother reported they were married in 2011 and separated in October 2013. Mother also reported that father was being discharged from the military because he tested positive for marijuana. Mother stated father did not pay any child support.

Mother described minor as "clumsy," particularly because minor had recently learned to walk. Mother stated boyfriend was "very caring" towards minor and was the

4

"'only father that [minor] knows.'" She also stated that minor "'loves'" boyfriend; that minor showed no fear of him; and that boyfriend did not cause the injuries sustained by minor. When Araiza told mother that minor had a skull fracture, mother began to cry but repeated that boyfriend "'would not lay a hand on [minor,] I know it.'"

The next day, when Araiza arrived for another in-person interview with mother and boyfriend, mother stated she had been trying to call Araiza that morning to explain how minor received the skull fracture. Mother then recounted how minor fell and hit her head on the tile floor in their apartment sometime between early December and Christmas 2013.

The detention report included an in-person interview of father conducted on January 21, 2014. He reported he was being discharged from the military because mother had called his commanding officer and reported father used marijuana, which led to a failed drug test. Father stated he had not seen minor for three weeks.

Father reported he maintained regular contact with minor, including on weekends, but that it had been about a month and a half since he last had her for an overnight visit. Father stated until recently he had no concerns about minor's welfare because he considered mother to be responsible and "'good'" to minor. Father also stated he became concerned about minor when he saw her with a black eye in mid-December 2013, but mother told him that minor had fallen and hit the door.

Father reported he heard from one of mother's neighbors on January 16, 2014 that minor was being abused. Father did not go to mother's apartment then to check on minor,

however, because the neighbor was calling police and because father believed he and mother would have ended up arguing. Father reported he wanted custody of minor and planned to move to Roseville, California to live with minor's paternal grandparents.

At the January 23, 2014 detention hearing, the court found that E.S. was minor's presumed father and that a prima facie showing had been made minor was a person described by section 300, subdivision (e), and, as such, ordered minor detained in foster care. The record shows the court ordered reunification services including "crisis intervention, case management, transportation and counseling." The court also ordered supervised visitation between minor and minor's parents.

In the March 10, 2014 jurisdiction/disposition report, Araiza recommended minor be declared a dependent of the juvenile court and placed in a licensed foster home. Araiza also recommended the parents continue to receive reunification services and have supervised visits with minor.

The March 10 jurisdiction/disposition report included several in-person interviews between agency social workers and mother. As relevant to the instant appeal, mother reported father drank alcohol "'every night,'" was a "'heavy drinker'" and spent $200 or more each week on alcohol. Mother denied any domestic violence in her relationship with father. Mother also stated that boyfriend was not responsible for minor's injuries; that she did not trust any of the doctors or their explanations regarding the cause of minor's injuries; and that minor was taken from her as a result of complaints by her neighbor.

6

In response to whether mother could have done anything differently to protect minor, mother told Araiza that she "'did everything humanly possible to protect [minor]'"; that there was nothing she could have done differently; and that minor was safe around boyfriend because mother knew him as they had been "dating . . . for approximately four months."

The jurisdiction/disposition report states mother reported that while mother and father were waiting for a court hearing on February 18, 2014, father showed her a picture of a "'three foot bong'" he had just purchased with their tax return money. Mother also reported that she was "'done'" trying to "'protect'" father; that she was upset father was seeking custody of minor; and that minor was not a priority for him.

During this same interview, mother reported that father had a history of smoking marijuana and that they both started smoking marijuana on an everyday basis starting in the spring of 2013, when she obtained her medical marijuana card. Mother indicated she did not trust father taking care of minor, as he had not made any lifestyle changes and continued to smoke marijuana, was unemployed and was not living with the paternal grandparents as he claimed, but instead was staying with friends. Mother also reported the paternal grandmother was going through cancer treatment and, thus, mother did not believe the paternal grandmother was in a position to support father, who, according to mother, had "never cared for [minor] for more than a few hours."

The jurisdiction/disposition report noted that Araiza attempted to contact father numerous times after the January 23, 2014 detention hearing by calling his mobile phone

7

and leaving messages, but that father did not return her calls or call the agency in response. Araiza and another agency social worker were able to speak with father by telephone on February 5, 2014, however. During that interview, father denied using marijuana with mother, denied he had a problem with alcohol and stated the last time he had smoked marijuana was on his birthday on January 28, 2014.

Father reported that while he and mother were married and living together, mother would bring boyfriend to their home when father was away; that when father got home, mother and boyfriend sometimes would be "'hanging out'" together; that, on one occasion when father came home from work, he found them together in his home and asked boyfriend to leave, but boyfriend refused; and that, on this occasion, father went into his bedroom and locked the door in order to get some sleep. When asked about minor, father reported on this occasion she was sleeping in her bedroom in another part of their home.

Father also reported that when they separated in October 2013, father paid the security deposit on mother's new apartment, knowing that boyfriend and mother would be living together along with minor. Father admitted he did not ask mother about boyfriend or seek any information about him from mother; when asked why not, father stated he "'assumed [mother] would make good decisions.'"

Father reported he did not attend minor's first birthday party because he believed that boyfriend would be in attendance, which made father "feel 'weird.'" Father also reported he was discharged from the military on January 22, 2014 because he had purchased marijuana for mother.

8

When asked about minor's injuries, father reported he believed boyfriend "'was smacking [his] daughter around.'" Father did not believe mother "'did this'" to minor, however, because mother was a "'good mom.'" When Araiza again asked about minor's black eye that father had seen in December 2013, father repeated mother had told him that minor had fallen and hit her head on the door. When Araiza informed father that mother had explained to Araiza that minor had fallen and hit her head on a toy wheel, father immediately agreed that he had given the wrong explanation and that mother was correct. Father denied changing his story to protect mother and reiterated that mother was not responsible for minor's injuries and that she was a"'good mom.'"

Father reported that one of mother's coworkers contacted him on January 16, 2014 concerned about minor's welfare. When asked why father did not go and pick up minor after he received this call, father stated he wanted to avoid a fight with boyfriend. When asked if he had called police to do a "welfare check" on minor, father said he did not because he had been told law enforcement already had been called. When asked if he would have done anything differently, father stated, "'I don't know what I could have done.'"

The record shows Araiza spoke to father by telephone on or about February 19, 2014 when father was living with the paternal grandparents in Roseville and after father and the paternal grandmother had visited minor. Father reported he wanted minor placed with him. In response, Araiza asked why father had not shown more interest in minor since she had been removed from mother, including calling minor's foster mother to

9

check in on minor or calling agency to learn what he needed to do to reunify with minor. Father stated that he called mother for updates regarding minor and that he trusted what mother told him about minor. Father also stated that he called minor's foster mother but did not leave voicemails "because in the military he [i.e., father] has been trained to be careful with personal information."

During this same telephone interview, Araiza told father if he wanted minor placed with him he needed to make his daughter a priority. Father reported that while he was living with the paternal grandparents, he did not always stay with them because it was "'hard to live with [his] parents again, but if [minor was] placed with [him] then [he would] live there.'" Araiza reminded father to enroll in parenting classes and find a therapist. Father in response said he preferred not to participate in individual therapy. Araiza told father that his participation in such services was completely voluntary.

The March 10 jurisdiction/disposition report also included the summary of a February 13, 2014 telephone interview *initiated* by father's mother, minor's paternal grandmother. She reported to Araiza that she was then receiving cancer treatment two times per month but that she had two daughters who lived nearby that also could help in caring for minor. The paternal grandmother then asked Araiza if father was "doing everything he has been asked to do by the Agency" with respect to minor. Araiza responded father had recently started communicating with her but had not called the foster parents to check on minor, which Araiza found "very concerning." The paternal grandmother stated in response, "'That's what I figured. That's why I'm calling.'"

The jurisdiction/disposition report included the following summary of a conversation between Araiza and the paternal grandmother:

"I [i.e., Araiza] explained to the paternal grandmother that it is the father's responsibility to call the Agency and to check on the well being of [minor]. The paternal grandmother reported that she has been asking him [i.e., father] if he had called the social worker. She stated, 'I got the F U, when I asked him why he was not calling you.' I asked her if the father is living in her home at the time. She stated, 'His stuff is here, but I have not seen much of him. He has not been spending the night here.' She reported that she has advised the father to call and follow up on what he needs to do in order to have [minor] in his care. She stated, 'If she was my child I would stop at nothing to get her back.' I asked the paternal grandmother if she was surprised that the father had not been in communication, she stated, 'No.' She reported that the father has not been sharing any information with her or her husband. I informed the paternal grandmother that I was encouraging the father to attend the next Court hearing. She asked if she could come with him so that he could visit with [minor.] I encouraged her to be a support to the father."

As to father, the jurisdiction/disposition report concluded as follows:

"[H]e has not demonstrated that he can be protective of [minor] or that [minor] is a priority for him at this time. On 1/16/2014 the father was contacted and informed by the mother's neighbor that [minor] was at risk of physical abuse and the father took no action to protect [minor] because he says he wanted to avoid a fight with [boyfriend]. This

11

indicates that his daughter's safety was not important to him at that critical moment and he chose to put his daughter's life in the hands of the neighbor who is a stranger to him. In addition, the father failed to communicate with the Agency from 1/23/2014 to 2/5/2014 until the mother contacted him and put him in contact with PSW Araiza. As of 2/18/2014 the father had not had any contact with [minor] and failed to communicate with [minor's] foster parents to check on [minor's] wellbeing especially since he is unemployed and has additional free time. The Agency would like to see the father demonstrate that he wants to put [minor's] needs ahead of his own . . . and wants to make [minor] a priority in his life. It is unknown if the father can or is willing to be protective of [minor] to avoid further abuse to [minor]. On 1/22/2014 the father was discharged from the [military] due to substance abuse and tested positive for marijuana on 2/18/2014."

The March 18, 2014 addendum report summarized a March 13, 2014 telephone conversation between Araiza and the paternal grandmother, which took place a few days after a Placer County social worker had visited the paternal grandmother's home.[4] After

---

4     At the March 18 contested jurisdictional/dispositional hearing, the record shows *father* objected to the admission of the March 18 addendum report on the basis his counsel had not yet had an opportunity to interview the Placer County social worker and the paternal grandfather, whose statements/observations were included in that report. The court in response admitted the March 18 addendum report with the exception of these statements/observations. It does not appear from the record that the portions of the addendum report excluded at the March 18 hearing were subsequently admitted at the continued hearing held on March 24, 2014. Nonetheless, in his briefing, father relies on portions of the March 18 addendum that were excluded at *his* request, when he contends the court abused its discretion by failing to place minor with the paternal grandmother. Even if we considered the (allegedly) excluded portions of the March 18 addendum report, however, we would still affirm the juvenile court's order in this case.

becoming aware that the paternal grandfather smoked marijuana for a medical condition, Araiza asked where it was kept at the house. The paternal grandmother in response "paused and stated, 'I don't think he keeps any here.'" When Araiza asked again where the marijuana was stored, the paternal grandmother "again paused and appeared to sound hesitant to respond, [then] stated, 'He gets it from [father].'"

The paternal grandmother reported in this same telephone conversation that father had stopped smoking marijuana. She also reported that she and her daughter (paternal aunt) had decided father no longer could go to the paternal aunt's home because the "paternal aunt's boyfriend and the father were playing video games and smoking marijuana all day."

The paternal grandmother also reported that she and the paternal aunt had prepared a room in the paternal grandmother's house for minor; that she and the paternal aunt had purchased all the supplies for minor's room and had spent all day decorating the room; that, if necessary, she would be willing to take guardianship of minor; and that she was excited to care for minor. The paternal grandmother said father had not paid for any of the baby items and had not invested any time in preparing minor's room.

The paternal grandmother reported she was disappointed father did not personally attend the court hearing on March 10, 2014. According to the paternal grandmother, she and father had planned to drive to San Diego for that hearing, but the day before they were set to leave, father stated they were not going because "'it was not worth spending all the money to visit with [minor] for an hour.'" The paternal grandmother also reported

13

she was upset by father's decision and believed it was important for them to visit with minor. Araiza, in response, told the paternal grandmother that father needed to set up visits with the foster mother ahead of time in order to visit with minor longer and that it was "father's responsibility to take [the] lead [in] this situation."

The March 18 addendum report shows Araiza also spoke to father the same day Araiza had spoken to the paternal grandmother. When asked by Araiza why he did not personally attend the March 10, 2014 hearing, father responded his "'front right tire and brakes needed to be looked at and [he] was not able to take [the car] in. Three tires were good and one was ready to pop at any time.'"

Father reported he had signed up for parenting classes that were set to begin on March 24, 2014. He also reported he had stopped smoking marijuana. With regard to the bong father had purchased, he stated he gave it and the rest of his marijuana away.

Araiza in the March 18 addendum report noted mother called the same day (i.e., March 13, 2014) and stated she did not want minor placed with father. Because mother was crying, Araiza found it hard to understand mother. Araiza recommended mother write down her concerns and address them with the court at the upcoming hearing.

At the March 18, 2014 contested jurisdictional/dispositional hearing, the juvenile court admitted the above reports (with certain exceptions, as noted *ante* in fn. 4). As relevant here, Araiza testified it would be detrimental to place minor with father. She testified that although father was not present when minor suffered the injuries, he did not take steps to protect minor. As an example, Araiza noted father's response, or lack

14

thereof, to the neighbor's January 16, 2014 report that minor was at risk. In that instance, father had not called police, had not gone and picked up minor or taken other steps to ensure that minor was no longer at risk of abuse, and had not followed up to check on minor's welfare.

Araiza testified that after minor was removed from mother's care, father failed to communicate with agency and minor's foster mother, including scheduling visits to see minor. Father instead waited almost a month after minor was placed in foster care to contact the foster mother. Moreover, after the January 23, 2014 detention hearing, Araiza noted father never called to check on minor, including to ensure she was recovering from what were serious injuries.

Araiza also testified that father had a history of substance abuse for marijuana and smoked marijuana on a "regular basis." Araiza noted father had tested positive for marijuana on February 18, 2014 and had been discharged from the military because of marijuana use.

When father saw minor in mid-December 2013 and noticed the child had a black eye, Araiza testified that father did nothing because he was afraid of boyfriend, even though boyfriend was caring for minor. Moreover, at the team decisionmaking meeting (TDM) in early February 2014, Araiza noted that father (who participated by telephone) did not object to boyfriend's participation in that meeting until after it had ended, despite the fact father believed boyfriend was responsible for minor's injuries; that father seemed unwilling or unable to stand up to mother and, thus, father might allow mother and/or

15

boyfriend to have contact with minor; and that because of his passivity and his past behavior, father was not able to protect minor, particularly when agency still had concerns about mother and her role in minor's injuries and when father continued to believe mother was not the cause of minor's injuries and was a "good mom."

Araiza also believed it would be a detriment to place minor with father because mother reported father also drank alcohol excessively; while living in Roseville, father regularly went to the home of the paternal aunt (who also would help with the care of minor), smoked marijuana and played video games with the paternal aunt's boyfriend; the paternal grandfather also smoked marijuana; the paternal grandmother was undergoing chemotherapy twice a month and took medication that at times depressed her immune system and/or required her to rest; father never parented minor on his own and was not a "hands on parent" with respect to minor; father only visited minor about three or four times in the four months before the hearing; and, despite being given referrals by the agency in early February 2014, father delayed in enrolling in services, including parenting classes and individual therapy.

The paternal grandmother testified that her husband used medical marijuana on occasion to manage back pain and that father supplied him with it. She further testified that as a result of her undergoing cancer treatment, the paternal aunt (who lived about five minutes away) would help with the care of minor when necessary. The paternal grandmother admitted that before minor was removed from mother, it had been more than a year since the paternal grandmother had visited with minor.

16

The paternal grandmother testified father could care for minor in their home, and she believed he was then ready to do so without any services, including parenting classes. When asked why she believed father had the requisite parenting skills to then care for minor, the paternal grandmother stated, "We raised him." The paternal grandmother also stated father was no longer smoking marijuana "[b]ecause he gave all of it away."

The paternal grandmother confirmed that when father returned to Roseville after being discharged from the military, father went over to the paternal aunt's house "a couple times a week" to play video games and smoke marijuana with the paternal aunt's boyfriend. The paternal grandmother stated father stopped going to the paternal aunt's home "about a month ago." Although the paternal grandmother recognized father would be minor's primary caregiver if minor was placed with him, she stated her husband (i.e., the paternal grandfather), the paternal aunt and another paternal aunt who lived about an hour away also were ready to assist father in providing care for minor, including after he found employment.

Father testified he did not have a drug problem, and he last smoked marijuana about a month before the hearing. He also testified he did not have a drinking problem, and had "a drink" of alcohol in the evening.

When asked about the incident on January 16, 2014 when the mother left work in response to neighbors' concerns about minor, father testified one of mother's coworkers initially left him a message that "there was something going on with [minor]" and mother had to "rush out of work." Father stated he asked the coworker to have the "people that

17

were calling" mother at work call him so he "could try to figure out what was going on." Father admitted the message he received from mother's coworker raised some "red flags." Father next received a call from one of mother's neighbors who told him "they had seen a bunch of stuff going on," including "see[ing] this guy [i.e., boyfriend] hitting [minor] and all this stuff happening, and they were going to call the police."

Even though father lived close by, father testified he did not go over to mother's home to check on minor because the "sheriff[] had already been called out, and I [had] been threatened [by] this guy [i.e., boyfriend] about fighting with me several times . . . and he was going to, quote, unquote, kick my ass. I didn't want to go over there and get in a fistfight and get in trouble with the law myself. So I counted on the sheriff to go over there, and I assumed since I was the father, I would be contacted if anything was going on." Father further testified he subsequently learned from mother the sheriff had checked on minor and had found nothing wrong.

Father stated that he had in fact purchased a bong to smoke marijuana but that it was not three-feet long and that, in any event, he no longer owned it. Father also stated he gave the bong away to the paternal aunt's boyfriend. Father admitted he played video games and smoked marijuana with the paternal aunt's boyfriend about 10 hours a week. When asked whether he would allow the paternal aunt to watch minor in the paternal aunt's home despite the fact her boyfriend smoked marijuana, father said "Yes."

Father testified he learned about the end of October 2013 that mother and boyfriend were moving in together. At the time, father was living about a mile and a half

18

from mother's new apartment. Father admitted he did "nothing really" to investigate boyfriend before he moved in and began taking care of minor. Father testified he was not then concerned that mother and boyfriend were going to live together with minor even though father did not know boyfriend.

Father testified minor had a black eye in early December 2013. Mother told father that minor had fallen and hit a door. Father at that time did not check minor for any other injuries or seek a medical examination of minor, despite the fact boyfriend was then threatening to "kick [father's] ass" and was then living with and taking care of minor. Father admitted he did no further investigation regarding minor's black eye other than to speak to mother. When asked why he did nothing more, father stated: "I didn't think this was something that people did to kids."

Father testified mother sometimes gave minor a "little swat on the bottom" when minor misbehaved. Father did not like spanking and tried to address it with mother. He noted, however, mother was "very opinionated" and it was "hard for [him] to ever win an argument [with mother] about anything."

With regard to the February 2014 TDM in which father appeared by telephone, father testified he did not know he could object beforehand to boyfriend's participation in that meeting. Father also testified he had not planned on coming to San Diego for that meeting until the paternal grandmother told him the Friday before that she had made plans for them to attend in person. Father said when he learned of those plans, he tried to

19

fix his car but was unable to do so in time to make the long drive from Roseville to San Diego.

Father admitted an agency social worker gave him referrals for services, including parenting classes as early as February 5, 2014, but he had yet to begin such services. However, father testified he was then on one or more waiting lists to begin those services.

Father explained that he did not visit minor after he moved from San Diego on or about January 23, 2014 until about February 16, 2014 because he had been helping the paternal grandparents with their house in Roseville and because he was preparing to bring minor home to live with him.

Mother testified at the contested jurisdiction/disposition hearing that minor was better off living in foster care than with father. When they were married, mother testified father smoked marijuana a "few times a week"; that he got drunk "every night," played video games and fell asleep on the couch; and that she alone provided the day-to-day care of minor. Mother confirmed father recently had said he purchased a three-foot bong and had even showed her a picture of it. She testified that, after they separated, she contacted father weekly about visiting minor. However, between October 2013 and January 2014, mother stated father visited minor only about three times.

Mother testified when minor visited father, including overnights, father did not know how to care for minor. For example, on one visit she told father that minor needed to "start eating real food like people food, and if he didn't have that, I [i.e., mother] would go to the grocery store and buy it myself and bring it there so she [minor] would have

something to eat." The next day when mother picked up minor, father said he gave minor "some pistachios or some cashews and milk, no formula bottles, no baby food, no snacks, or anything of that kind," which concerned mother. Mother stated she always packed a diaper bag, which included food for minor, when minor visited with father because mother did not trust father to buy basic items for minor.

Mother testified she was concerned about the paternal grandmother caring for minor because the paternal grandmother drank alcohol when she took her medications, which made her "loopy. I guess I [i.e., mother] could say she [i.e., the paternal grandmother] is not really coherent a good portion of the time." Mother also recounted that when minor was a newborn, the paternal grandmother in minor's presence had become angry and thrown a wine glass across the room.

Mother reaffirmed her belief that boyfriend was not in any way responsible for minor's injuries. Mother testified she still wanted boyfriend to visit with minor because boyfriend was a "good father" and "he did not do the things people are saying he did."

On rebuttal, Araiza testified that the TDM facilitator specifically asked everyone to identify themselves at the beginning of the February 2014 meeting. Araiza recalled boyfriend introduced himself, and the facilitator then asked if anyone had any questions or objections. According to Araiza, father then did not object to boyfriend's participation in the TDM despite being given that opportunity.

At the conclusion of the contested jurisdiction/disposition hearing, the trial court sustained the petition, ruling in part as follows:

"The court has read and considered the reports admitted into evidence, takes judicial notice of the findings and orders. [¶] I have listened carefully to the testimony and the manner in which the witnesses have testified, and I would be remiss in saying that every so often I get a trial and people take the same oath, and you get such divergent stories. So somebody is really lying to me today, and I don't like that, and it's not easy for me to figure out, but oaths are something that we should take seriously because we swear that we are going to tell the truth.

"I have listened to the arguments of counsel. [¶] I have considered the documentary evidence that was admitted into evidence. [¶] . . . [¶]

"By clear and convincing evidence the allegations of the petition are true; however, I will be amending according to proof and indicate that the previous bruising injury instead of burn injury, I will modify the petition with regards to that, but I will make the finding by clear and convincing evidence.

"Then with regard to disposition, the court makes the following findings by clear and convincing evidence:

"That jurisdiction having been found under section 300[, subdivision] (e), the child is declared a dependent pursuant to [section] 360[,] subdivision (d).

"Custody will be removed from the mother pursuant to [section] 361[, subdivision] (c)(1) . . . and [minor will be] placed with the agency for suitable placement.

22

"There is a substantial danger to the physical, health, safety, protection or physical or emotional well-being of the child or would be if the child was returned home.

"There are no reasonable means by which the child's physical health can [be] protected without removing the child from the mother's custody.

"Reasonable efforts have been made to prevent or eliminate the need for the removal of the child from the home of the mother.

"The father was a noncustodial parent. Pursuant to [section] 361.2 by clear and convincing evidence it would be detrimental to place the child with him, and I want to note that this isn't a substantial risk of physical harm. You make that finding when you are removing from a custodial parent. Father was noncustodial and under [section] 361.2 the court has to find by clear and convincing evidence that it would be detrimental to the safety, protection, or physical or emotional well-being of the child. So it's a little bit different when are you dealing with a noncustodial parent and what is the detriment?

"The detriment is his true passivity. That's the number one piece of detriment here. Any parent who has had a one-year-old child in their arms, and I'm just trying be reasonable here, you know, I have experienced this, and I'm not holding myself up as the parent of the year, but anybody who has that and gets a buzz in their ear that this child could be in danger, that this child could be harmed, is going to move heaven and earth because that is how vulnerable little babies are, and even if mom is living with sasquatch, and he's the meanest, badest guy in the world, then, you call the cops or you do something to make sure that your child is okay.

23

"Now, I'd be a little concerned if I walked into my house, and sasquatch was sitting there, and I asked him to leave, and he gave me a dirty look, and I just left it there. I mean, this is someone who has some serious issues about protecting a child. As I sit here today, I think he's afraid of the mom, and I truly believe if she went up to Roseville and brought her boyfriend with her and did something aggressive, I'm not sure that the dad would be able to protect [minor].

"Now, I'm not criticizing him for this. This might be his personality, but I'm discharging him with the need to change that personality if he's going to be a protective custodial parent. So I'm not saying there is a ton of work to be done, but he certainly has to understand what his obligation is, a very high obligation, to protect a child let alone an infant child.

"Marijuana is an issue. We haven't been able to rule it out, but from his own admission, he was a stoner in high school. He smoked quite a bit. He went into the military, and I have got to say this, I doubt he was smoking as much as everybody said he was because they probably would have nabbed him because they do test in the military, and they do it at random, but then he goes home with all this stuff going on, and when the new boyfriend is in the house, who is according to in his mind is threatening to kick his ass, he leaves his little baby there and tells me I didn't think adults would do that to kids, well, then, my question is what if he takes this child to a day care, and the child comes home bruised, would he say, gee, I didn't think adults could do that? So I'm just going to ignore these bruises.

24

"These are the things I don't get because to me they're pretty reasonable, but obviously, he needs to wrap his head around this as to how vulnerable these kids are, what he needs to look for and what it takes to be protective parent. We will try to rule out the marijuana issue. He's bummed, though, he's in the home of his parents so he goes somewhere else.

"I've got another suggestion. Go get a job. He obviously has skills. He is not some guy who only can flip a burger . . . . He was in the military for a while. I really have a suspicion here that there is some kind of job out there that he could find and now it's time for the party to be over. So put those video games away, put the bong away, and get to work because parenting is hard, hard work, and it's all about that child now. It's not about you anymore. You have got to put the bong away. [¶] . . . [¶]

"That's my detriment finding. That's the facts that support the detriment finding.

"Placement is in licensed foster home.

"I'm going to order that all relative homes continue to be evaluated. This is one of those regulation things. I'm not going to fault the agency.

"Father was requesting custody. The agency can't do a full investigation until the father is out of the home [i.e., of the paternal grandparents]. He is going to have to make a decision now whether he is going to get a job and move out and let this home be evaluated. If he gets himself in services and does well in individual therapy, I believe he could be in a position to have custody of this child sooner rather than later if some

25

therapist could tell me that he gets it, and he will become someone, and he tests negative for marijuana.

"With regard to the mom, I'm going to order services. . . . [¶] I will find that the child is closely and positively attached to the mother.

"The other alternative is for me to find that the services are likely to prevent reabuse or continued neglect.

"To be honest with you, I don't think she is ever going to believe that the boyfriend did this stuff, and I don't know where this case is going to go in reunification if she won't even consider the fact that this guy may have done this in light of this evidence that you can't even consider it, then, my conclusion is she needs him to pay that rent right now, or she needs him to support her so she's not about to say anything bad because she needs him.

"I'd like you to consider that, or I may be wrong. If I am, I deeply apologize, ma'am. These are very, very well-trained people. They don't make this stuff up because they enjoy removing babies from their parents. Where there is some smoke there is some fire, and I think you just might want to consider that maybe some of this evidence is true and maybe he just busted your kid's skull. Just think about it. Maybe he did. [¶] . . . [¶]

"The parents are ordered to comply with the plans.

"The agency is ordered to provide services consistent with the plans. [¶] . . . [¶]

"I want to comment on some evidence that I have indicated this last time dad does live ten hours away. It isn't easy to travel to and from north Sacramento. That is a long

26

drive. That was not the basis for any kind of detriment finding. Same with the grandparents, but you can do a lot of things over the phone, and even if you are broke, you can make those calls. You can make them until you annoy people to no end so much that they respond to you. So I don't believe the fact that there was some distance to excuse him from doing everything I think he should have done, and could have done, and reasonably should have done, as a responsible parent."

DISCUSSION

A. *Placement of Minor with Father*

Father contends that the juvenile court erred by finding that placement with him would be detrimental.

Section 361.2, subdivision (a) provides: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

A court's determination of detriment under section 361.2, subdivision (a) requires a finding by clear and convincing evidence. (See *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827; see also *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581 [noting that in an appeal from a judgment or order based upon clear and convincing

27

evidence, """the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong"""].)

In making this determination, a court should weigh all relevant factors, decide whether the dependent child "will suffer net harm" (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425), and consider the "fundamental premise that the underlying purpose of dependency law is to protect the welfare and best interests of the dependent child" and "the purpose of any dependency hearing is to determine and protect the child's best interests." (*Id.* at pp. 1424-1425.)

When the sufficiency of the evidence is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible, and of solid value—to support the conclusion of the trier of fact. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) All conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. (See *In re Jason L.*, *supra*, at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16; see also *In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [noting a court of review has "no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses"].)

Here, we conclude there is substantial evidence in the record to support the finding that placement of minor with father would be detrimental to minor's "safety, protection, or physical or emotional well-being." (See § 361.2, subd. (a).)

There is ample evidence in the record that father routinely smoked marijuana, including *after* he was discharged from the military for drug use in late January 2014 and *after* he moved to Roseville to live with the paternal grandparents shortly thereafter. This evidence included mother's testimony that she and father routinely smoked marijuana when they were married, including after she obtained her medical marijuana card in spring 2013, and that while they were waiting for a court hearing on February 18, 2014, father told her he had *just* purchased a bong and had even showed her a picture of it.

In addition, the paternal grandmother testified that father (her son) provided the paternal grandfather (her husband) marijuana for a medical condition and that, *after* moving to Roseville, father routinely went to the paternal aunt's house and smoked marijuana and played video games with the paternal aunt's boyfriend.

Father himself also admitted that he recently had purchased a bong. He also admitted going over to the paternal aunt's house a few times a week and smoking marijuana with her boyfriend after father moved to Roseville to live with the paternal grandparents. Father testified that he gave his bong to the boyfriend of the paternal aunt and that, if minor was placed with father, he would allow minor to be watched at the paternal aunt's home even though the paternal aunt's boyfriend routinely smoked marijuana.

29

The record also shows father tested positive for marijuana on February 18, 2014 and was discharged from the military in late January 2014 also because of a positive marijuana test result.

We conclude this evidence alone supports the finding that placing minor with father would be a "detrimental to the safety, protection, or physical or emotional well-being" of minor. (See § 361.2, subd. (a).)

But, there is more. The record also shows that after mother's neighbor notified father in mid-January 2014 that minor was at risk, father did little if anything to protect minor. Indeed, the record shows father took no initiative to determine whether minor was being abused despite the neighbor's report: father did not call police or otherwise go to mother's house, which was located about a mile away from his, to check on minor. Father instead merely spoke to mother on the telephone, even after father admitted there were "red flags," and took her word that minor was fine and that the reports of abuse were false. Father assumed that he would be contacted if there was a problem.

Father's lack of initiative with respect to protecting minor and ensuring her safety is even more concerning given the evidence in the record of his awareness that minor suffered a black eye in early December 2013, when minor was also living with, and being taken care of by, boyfriend. The record shows father then also accepted mother's explanation that minor received the injury accidently. Father also did no additional investigation then to determine the cause of minor's injury and took no other steps, including having minor examined, to ensure mother's explanation was credible.

30

And, if that was not enough, father's failure to do more in caring for minor is even more alarming given the evidence in the record that mother had moved in with boyfriend in late October 2013, after knowing boyfriend for just a few months and after boyfriend had threatened to "kick [father's] ass." Father also testified that he never investigated boyfriend; that he assumed minor was safe and well-cared for because mother was a "good mom"; and that he was unaware that people like boyfriend actually hurt "kids" like minor. We conclude this evidence also supports the finding of detriment pursuant to section 361.2, subdivision (a).

Finally, the record shows father had spent very little time parenting minor both after he and mother separated and after minor was removed from mother. Although father testified at the contested jurisdictional/dispositional hearing that he wanted to care for minor, there is ample evidence in the record supporting a contrary finding, including that father visited infrequently with minor after father was discharged from the military in late January 2014, despite being unemployed; that he did not call the foster mother for about a month after minor was removed to inquire about minor and to ensure she was recovering from what were *serious* physical injuries; that he did not give the foster mother sufficient advance notice regarding visits with minor and, thus, such visits were unnecessarily short, lasting just a few hours; that he delayed obtaining the services referred by agency that would promote reunification; and that, when minor visited father including on overnights, father ostensibly was unable to meet minor's basic needs, including proper feeding of minor. Again, we conclude this evidence, standing alone,

31

more than supports the finding of detriment under subdivision (a) of section 361.2 and, along with the other evidence already discussed, overwhelmingly supports such a finding.

B. *Placement of Minor with the Paternal Grandmother*

Father alternatively contends the juvenile court erred when it failed to place minor with the paternal grandmother. The record shows that the court refused to place minor with the paternal grandmother because the home evaluation of the paternal grandparents was incomplete; that agency guidelines precluded agency from completing the home evaluation because father was then living with the paternal grandparents; and that agency therefore was *not* at fault for failing to complete that evaluation at the time of the jurisdictional/dispositional hearing.

Appellate courts recognize that the relative placement preference in section 361.3 confers upon a relative a separate, protectable interest with a dependent child. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034-1035.) Thus, an aggrieved relative who was denied placement, such as the paternal grandmother in the instant case, may therefore possess standing to challenge a court's placement order, while a parent, such as father, might not. (See *ibid.*)

Although neither father nor agency has briefed the issue of standing, we will assume, without deciding, that father has standing to challenge the court's decision not to place minor with the paternal grandmother.[5] (See *In re Esperanza C.* (2008) 165

_____

[5]     In reaching this issue, we are not unaware that *if* minor had been placed with grandmother *without* any additional conditions imposed by the juvenile court, minor then would have been living under the same roof as father, *despite* the court's finding under

32

Cal.App.4th 1042, 1053 [noting courts liberally construe the issue of standing in juvenile dependency matters and resolve doubts in favor of a right to appeal].)

Section 361.3, subdivision (a) provides in part: "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status.  In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] . . . [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents. [¶]

section 361.2, subdivision (a) that placing minor with father was then detrimental to minor.

(F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H) Provide legal permanence for the child if reunification fails. [¶] . . . [¶] (I) Arrange for appropriate and safe child care, as necessary."

Applying these factors, we conclude substantial evidence supports the finding it was not in minor's best interests to be placed with the paternal grandmother and, accordingly, there was no abuse of discretion in not doing so here. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [noting denial of a relative placement request is reviewed under an abuse of discretion standard].)

The record shows that minor recently had endured severe child abuse that included, among other injuries, a cracked skull; that there were concerns regarding minor's development, including communication, fine motor and problem solving skills; and that minor was slated to undergo behavioral/social-emotional screening and also speech evaluation at Rady's. This evidence supports the finding it was then in minor's best interests to continue placement in foster care in San Diego, where minor could obtain these services and continue without interruption to receive necessary medical treatment.

In addition, the record shows that mother opposed placement of minor with the paternal grandmother (see § 361.3, subd. (a)(2)) and that mother and minor were "closely and positively attached," a finding that is both supported by substantial evidence in the record and, in any event, not challenged by father on appeal. As such, the record

34

supports the separate finding that it was not then in minor's best interest to place her with the paternal grandmother in Roseville, which is north of Sacramento, while mother was receiving services in San Diego in an effort to reunify with minor. (See *In re Joseph T.* (2008) 163 Cal.App.4th 787, 798 [noting "compelling reasons" in the record supported a finding that it was not in a dependent child's best interests to be placed with a paternal aunt because, among other factors, the aunt lived in another county and, as such, placement of the child there would have frustrated the child's best chance of reunification with his mother]; but see *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1068 [noting the court abused its power in not placing dependent children with the paternal grandparents when the evidence showed the grandparents had been caring for the children since they were infants, including providing them housing, clothing, medical care and schooling, and when the children said they wanted to remain living with their grandparents].)

Moreover, although the paternal grandmother made efforts to visit with minor after she was removed from mother's care, the record shows the paternal grandmother did not visit with minor for more than a *year* before her removal. The evidence in the record thus supports the finding there was not then a close relationship between the paternal grandmother and minor, in contrast to the relationship between mother and minor. We conclude the "nature and duration" of the relationship between minor and the paternal grandmother therefore was not such that minor's psychological or emotional needs would be compromised or unmet if minor remained in foster care in San Diego and continued weekly visits with mother. (See § 361.3, subd. (a)(1) & (6).)

Finally, the record shows agency then did not support placement of minor with the paternal grandmother because of various risk factors, including the paternal grandmother's ability to care for minor as a result of her undergoing cancer treatments, which the record shows at times made her feel tired and weak; the grandfather's use of (medical) marijuana, which the record shows he obtained from father and which he used to treat his back pain; and the regular use of marijuana by the boyfriend of the paternal aunt, who lived about five minutes from the paternal grandparents' home, which aunt, the record shows, had also agreed to care for minor if placed in the care of father or the paternal grandmother.

In light of the statutory criteria *ante*, we conclude substantial evidence supports the finding that placement of the minor with the paternal grandmother was not then in minor's best interests. (See *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 [noting that section 361.3 does not create a presumption that relative placement is in a dependent child's best interest and noting the overarching duty of the court is to "'assure the best interests of the child'" in placing that child].)

DISPOSITION

The juvenile court's order placing minor in a licensed foster home in San Diego and not placing minor with father or the paternal grandmother in Roseville is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

IRION, J.