Filed 5/19/16  P. v. Brooks CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RENARD BROOKS, JR.,<br><br>    Defendant and Appellant. | F069309<br><br>(Super. Ct. No. F13909794)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne R. Ellison, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Renard Brooks, Jr., was convicted by jury of kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1), count 1),[1] kidnapping in the commission of a carjacking (§ 209.5, subd. (a), count 2), first degree residential robbery (§ 211, count 3), second degree robbery (§ 211, count 4), first degree residential burglary (§§ 459, 460, subd. (a), count 5), and possession of a firearm by a felon (§ 29800, subd. (a)(1), count 6). In addition, the jury found true an enhancement allegation that defendant personally used a firearm in the commission of counts 1 through 4 (§ 12022.53, subd. (b)).

Defendant also admitted one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), one prior serious felony conviction (§ 667, subd. (a)(1)), and having served prior prison terms (§ 667.5, subd. (b)). He was sentenced to a prison term of life with the possibility of parole plus 17 years.

Defendant contends the trial court erred by admitting out-of-court witness identifications allegedly based on unduly suggestive procedures. He claims a detective who conducted two photographic lineups impermissibly directed the witnesses' attention to defendant's photograph during the lineup. We disagree and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

### *The Crime*

On October 7, 2013,[2] between 7:40 a.m. and 7:45 a.m., Allison Casagrande said goodbye to her husband Timothy Casagrande and left her home for work.[3] She left without locking her front door.

As she walked to her car, she noticed a Black male with short black hair, approximately six feet tall and 200 pounds, walking down the sidewalk about 60 to 65

---

[1]All undefined statutory references are to the Penal Code unless otherwise indicated.

[2]All dates occurred in 2013.

[3]Because Allison Casagrande and Timothy Casagrande share the same last name, we refer to them by their first names. No disrespect is intended.

feet from her home. The man, whom she later identified as defendant, was looking down at his phone. He was wearing dark pants, a black backpack, and a gray sweatshirt. Although he appeared out of place, Allison thought he could be a high school student, so she proceeded to drive to work.

Timothy testified shortly after Allison left, he was walking toward his bedroom when he saw a man standing at the end of the hallway. The man, he later identified as defendant, pointed a gun at him and told him to get down. Timothy briefly saw defendant's face before defendant hit him, knocked him to the ground, tied Timothy's hands behind his back, and then blindfolded him with a shirt he pulled over his head. Timothy described the intruder as a Black male with short hair, wearing a dark sweatshirt over a red T-shirt, blue jeans, and black and white gloves.

Defendant asked Timothy where his guns, money, and safe were located. Timothy told him he had some guns and jewelry inside of a closet in the home. After trying, unsuccessfully, to elicit the combination to the safe, defendant asked where Timothy's watch and wedding ring were.

Defendant moved Timothy into the garage and positioned him face down in the backseat of Timothy's car. He loaded the vehicle with various items from inside the home and drove away. Timothy was still in the backseat.

Defendant stopped to purchase gas using Timothy's gas card, drove to another location, and asked Timothy for his debit card and PIN (personal identification number). Defendant continued to drive around with Timothy blindfolded in the backseat. He made several more stops, during which time he removed from the car the items he took from Timothy's home. Half an hour later, defendant stopped the car, told Timothy the keys were under the seat, instructed him to count backwards from 100, and fled on foot.

Timothy freed himself from his restraints and asked a pedestrian for assistance. The pedestrian called 911 and Timothy was taken by ambulance to the hospital. He suffered a concussion, bruised ribs, and various scratches and bruises.

3.

*The Investigation*

Christopher Casagrande, Timothy's son, came to his parents' home after his father failed to show up for a scheduled game of golf. After observing the condition of the home and seeing blood on the carpet, he called 911 to report his father missing. Fresno police responded to the residence shortly before 10:00 a.m.

Around 11:00 a.m., Fresno police were notified Timothy had been located. Both Allison and Timothy provided descriptions of the suspect to police. They also advised police various items were missing from their home, including several shotguns, some electronics, jewelry, and men's suits.

Timothy's gas card showed an unauthorized transaction for gas purchased at a Fresno service station on the day of the incident. His checking account showed an ATM (automated teller machine) debit withdrawal of $300 on this same date. Video surveillance from the ATM where the withdrawal occurred depicted an individual— matching the description of the suspect provided by Allison and Timothy—withdrawing money from the couple's checking account.

On October 7th, a still photograph taken from the surveillance video was sent to the media and shown on the local news. That evening, Lacandis Judge and Janay Maynard, friends of defendant's, saw a picture of the suspect on the news and thought the suspect resembled defendant. When Maynard confronted defendant, he denied culpability. He claimed he was working at a warehouse when the incident occurred, but he could not provide proof of his employment. Defendant later told Maynard and Judge he spoke with his parole agent to clear up the incident and claimed his parole officer stated the suspect had been apprehended.

On October 8th, Detective Benjamin Barnes received a phone call from Parole Agent Richard Cazares. Defendant had contacted Cazares and stated he wanted speak to him and the detectives handling the case because defendant's family members saw a

4.

photograph of the suspect on the news and remarked that defendant resembled the suspect. Barnes met with defendant and his parole officer later that day.

Defendant told Barnes he was visiting with family, and he and his family had stayed at the apartment of his stepsister, Tina Collier, on the night of October 6th. Defendant stated he was at Collier's apartment all day on October 7th, and Collier would confirm his rendition of events.

On October 8th, detectives interviewed Collier. She initially told detectives defendant had slept at her house on the night of October 6th, and she saw him sleeping on her couch the following morning when she left to take her daughter to school. Collier stated she did not see defendant again until 3:30 p.m. later that day, when she saw him on the bus. When she saw defendant, he was wearing a red T-shirt and jeans.

When detectives interviewed Collier again on October 14th, she told them she was not sure whom she saw on her couch the morning of October 7th.

Video surveillance footage from the Fresno city bus showed defendant getting on the bus at a stop next to Collier's apartment at approximately 6:51 a.m. on October 7th. The video showed defendant exiting the bus at approximately 7:35 a.m. at a location two blocks away from the Casagrande home. At 11:03 a.m., additional video surveillance showed defendant entering a bus near Florence and Martin Luther King Boulevard. Defendant released Timothy in the area of Martin Luther King Boulevard and Florence Avenue around 10:45 a.m.

Defendant exited the bus in downtown Fresno at 11:17 a.m., where he boarded another bus two minutes later. Around 20 or 30 minutes later, he ended his trip near his brother's apartment in northwest Fresno. Defendant was wearing a black hooded sweatshirt and jeans in all of the video footage. The third video showed defendant wearing a red T-shirt under his sweatshirt. Fingerprints found on a bus ticket in Timothy's car were determined to be consistent with defendant's fingerprints.

5.

Defendant was arrested on October 14th. At the time of his arrest, he had a Seiko watch in his left front pants pocket and a gold ring hanging from a gold chain around his neck. Timothy identified the watch and the ring as his. That same day, police searched Lacandis Judge's apartment and discovered a black backpack as well as mail with defendant's name on it.

During police questioning, defendant claimed he left Collier's apartment on the morning of the incident to apply a tattoo. When questioned why he was wearing the victim's ring, defendant declined to answer detectives. He claimed he had Timothy's watch because he had received it as payment for a tattoo he had done.

## *Photographic Lineups*

On October 11th, Detective Barnes conducted two separate six-pack photograph lineups of potential suspects. Timothy and Allison were kept separate during the procedures. Prior to displaying any photographs, Barnes admonished each witness the photographs may or may not depict the person who committed the instant crimes, and to indicate, after looking at all the photographs, whether the person who committed the crimes could be identified.

The following facts are taken from audio recordings and transcripts of the procedures.

### Timothy Casagrande

As Barnes laid down each photograph, Timothy made comments about the similarities and differences between his attacker and the person depicted in each photograph. Defendant's photograph was second in the photo array.

During the procedure, Barnes asked Timothy to describe defendant's photograph. Timothy continued to comment on the photos, without responding to Barnes. Barnes asked Timothy several times whether defendant's photograph resembled Timothy's attacker more than the other photographs. Timothy did not answer Barnes. He continued to remark on the similarities and differences as to each photograph. Barnes told him to

6.

sign the back of defendant's photograph, agreeing his photograph most resembled the suspect.

**Allison Casagrande**

Barnes laid out only two of the six photographs before Allison paused. Barnes asked her whether the man depicted in the second photograph was the man she saw outside of her home on the morning of the incident. Allison replied affirmatively. Barnes laid out the remaining four photographs, describing each photograph as he did. Once all of the photographs were displayed, Allison stated the second photograph looked like the suspect. Barnes asked Allison to sign the back of defendant's photograph.

*Motion in Limine*

Defense counsel filed a motion in limine, seeking to exclude Timothy's and Allison's out-of-court identifications of defendant from the six-pack photograph array. Counsel argued the identification procedure used was unduly suggestive and the identifications were unreliable.[4] He claimed Barnes repeatedly directed the witnesses' attention to defendant's photograph by asking Allison whether defendant was the man she saw outside of her home on the day of the incident and by asking Timothy specific questions about defendant's photograph, repeatedly directing his attention to defendant's photograph.

At the hearing on defendant's in limine motion, Barnes testified he prepared a lineup consisting of six photographs depicting individuals of the same age, who had the same skin coloring and facial features. In preparing the lineup, Barnes selected subjects based on Timothy and Allison's description of the suspect, as well as the ATM and bus video surveillance footage taken of the suspect.

---

[4]Defense counsel also argued the admonition given pursuant to the lineup was improper, and the photographs chosen were not sufficiently neutral because they did not contain an array of people of a similar complexion, physical features, and build. On appeal, defendant concedes the admonition was, in fact, proper. He also raises no challenge to the array of photographs selected.

When Barnes showed the photographs to Timothy, he remarked on the similarities and differences of each man in the photos compared to his memory of the attacker. When all of the photographs were displayed, Timothy picked up defendant's photograph and kept focusing on it. Defendant's photograph was the only one Barnes asked Timothy to describe because Timothy was focusing on it.

When Barnes showed the first two photographs to Allison, she became visibly upset and began to cry. She pointed at defendant's photograph, and in response Barnes asked her whether the man in the photograph was the man she saw outside her home. She responded that it was. After Barnes showed Allison the rest of the photographs, she identified defendant again.

The trial court denied defendant's motion, holding Barnes was reacting to the witnesses' behavior rather than emphasizing defendant's photograph. With respect to Allison, the court explained she had stopped Barnes when she saw defendant's photograph, before looking at the rest of the photographs. This behavior did not imply a suggestive lineup. With respect to Timothy, although the audio recordings alone could suggest Barnes was directing Timothy's attention to defendant's photograph, Barnes's testimony made clear he was responding to Timothy's behavior. Moreover, Timothy never identified defendant as the person who committed the crime, he merely identified defendant as the person who most resembled the suspect within the lineup.

At trial, Timothy identified defendant as the intruder, and Allison identified defendant as the man she observed outside her home.

## DISCUSSION

Defendant contends the witnesses' identification of him pursuant to the photographic lineups were the result of unduly suggestive procedures and the identifications were unreliable. He alleges Barnes repeatedly directed Timothy's attention to defendant's photograph, and Barnes asked Allison whether defendant was the suspect after she had the opportunity to view only two of the six photographs in the

8.

lineup array. We conclude the lineup procedures were not unduly suggestive and, in any event, we find no prejudice.

A defendant challenging the reliability of a lineup procedure bears the burden of demonstrating the procedure employed was (1) unduly suggestive and unnecessary; and (2) the identification was unreliable, taking into account the witness's opportunity to observe the criminal during the crime; the witness's degree of attention; the accuracy of the witness's prior description of the criminal; the level of certainty demonstrated at the time of the identification, and the time between the crime and the identification. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.) "'If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.'" (*Ibid.*) However, if the procedure is not impermissibly suggestive, our inquiry ends because there has been no due process violation. (*Ibid.*)

We review de novo a trial court's ruling on whether an identification is constitutionally unreliable. (*People v. Kennedy* (2005) 36 Cal.4th 595, 609, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) Upon independent review of the record, we conclude the photographic lineup procedures challenged here were not unduly suggestive.

**Timothy**

We initially note the audio recording of Timothy's lineup fails to resolve what occurred during the photographic lineup because it is difficult to reference which photographs he is referring to based only on his statements. From the recordings alone, it would be permissible to infer Barnes either repeatedly directed Timothy's attention to defendant's photograph, as defendant suggests, or that Barnes was asking questions about defendant's photograph in response to Timothy's behavior, as the Attorney General suggests.

Barnes's testimony, however, supplies us with a "first person vantage." Barnes testified he asked Timothy about defendant's photograph because Timothy kept focusing

9.

on defendant's photograph. After Timothy picked up defendant's photograph, Barnes asked him whether it matched the suspect more than the other photographs. From his testimony, it is clear Barnes was responding to Timothy's behavior rather than directing Timothy's attention to or otherwise emphasizing defendant's photograph. In holding the lineup procedures used by Barnes were not unduly suggestive, the trial court credited Barnes's testimony. We defer to the trial court's determination of the credibility of witnesses (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463) and independently observe Barnes's testimony is, indeed, consistent with the audio recordings.

Because we conclude the lineup procedure was not unduly suggestive, we need not reach defendant's argument that Timothy's identification of defendant was unreliable based on the totality of the circumstances. "If we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends." (*United States v. Bagley* (9th Cir. 1985) 772 F.2d 482, 492.) We reject defendant's argument that Timothy's lineup procedure was unduly suggestive.

**Allison**

Barnes testified Allison began to cry after he showed her the first two photographs in the lineup. When she pointed to the second photograph, defendant's photograph, Barnes asked her, "is that him?" She responded affirmatively. Barnes proceeded to show her the rest of the photographs and once they were laid out, Allison identified defendant again.

Even without Barnes's testimony, it is readily apparent from the audio recording Allison almost immediately recognized defendant as the man she saw outside of her home on the morning of the incident, and Barnes had only responded to her reaction. Barnes's testimony bolsters this conclusion because, as he stated, Allison pointed at defendant's photograph before he finished displaying the remaining four photographs in the lineup array. There is simply no evidence Barnes used impermissibly suggestive procedures in conducting her photographic lineup.

10.

Although we find no due process violation, we note even if we were to find the lineup procedures were unfairly conducted, defendant cannot show prejudice from the trial court's failure to exclude the witnesses' identifications. Under *Chapman v. California* (1967) 386 U.S. 18, 24, the People must prove beyond a reasonable doubt the error complained of did not contribute to the guilty verdict. "[T]he appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.'" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

Even under *Chapman* review, defendant would not be entitled to reversal. Defendant's fingerprints were consistent with fingerprints on a bus ticket found inside Timothy's vehicle, Timothy's stolen wedding ring and watch were found on defendant's person when defendant was arrested, and a man resembling defendant was depicted on ATM surveillance video withdrawing money from Timothy's checking account on the morning of the incident. A man identified as defendant was also depicted on bus surveillance footage traveling to a location only blocks away from the Casagrande home, just prior to when the incident began, and he was depicted traveling from the location Timothy was eventually dropped off at, shortly after the incident concluded. Further, Tina Collier, defendant's alibi witness, recanted her claim defendant was asleep on her couch when she left to take her daughter to school the morning of the incident.

In light of the strong evidence presented against defendant, reversal of his conviction would not be warranted even if the identifications were suggestive. Defendant has failed to meet his burden of establishing unduly suggestive lineup procedures occurred. We conclude the lineup procedures employed by Barnes were not "'""so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'""" (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1051.) We, therefore, reject defendant's claims.

11.

**DISPOSITION**

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:

_____
GOMES, Acting P.J.

_____
POOCHIGIAN, J.

12.